No. 22-16993

# In the United States Court of Appeals for the Ninth Circuit

PATRICK CALHOUN, ELAINE CRESPO, MICHAEL HENRY, CORINICE WILSON, RODNEY JOHNSON, and CLAUDIA KINDLER,
*Plaintiffs-Appellants,*

v.

GOOGLE, LLC,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:20-cv-05146 (Hon. Yvonne Gonzalez Rogers)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS (UNDER SEAL)

NEIL K. SAWHNEY
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336

MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

(*Counsel continued on inside cover*)

September 25, 2023        *Counsel for Plaintiffs-Appellants*

LESLEY WEAVER
BLEICHMAR FONTI & AULD, LLP
1330 Broadway, Suite 630
Oakland, CA 94612
(415) 797-2617s

DAVID A. STRAITE
CORBAN S. RHODES
DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000

ADAM J. LEVITT
AMY E. KELLER
ADAM PROM
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900

JASON O. BARNES
THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

ERIC S. JOHNSON
JENNIFER M. PAULSON
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
(618) 259-6231

# TABLE OF CONTENTS

Table of authorities .................................................................. iii

Introduction ............................................................................ 1

Jurisdictional statement ........................................................... 5

Statement of the issue ............................................................. 5

Statement of the case .............................................................. 6

I.      Google expressly promises Chrome users that it will not send their personal information to Google unless they choose to "sync" their browser with their Google accounts. ................. 6

II.     Chrome secretly sends the data of the plaintiffs and millions of other users who did not sync to Google, which uses it to build detailed user profiles and to sell personalized ads .................................................................. 7

III.    After the plaintiffs file this case, Google argues that they consented to the data transmissions based on general language in Google's non-Chrome-specific Privacy Policy ................. 11

IV.    Judge Koh rejects Google's consent defense, concluding that a reasonable jury could find that the plaintiffs did not consent to having their data sent to the company. .............................. 13

V.     Discovery confirms that reasonable Chrome users would not expect their personal information to be sent to Google without syncing their accounts. ........................................... 14

VI.    Google moves for summary judgment on its consent defense. ................................................................................ 16

VII.   After discovery closes, Google is sanctioned for improperly withholding internal documents revealing that the company's "contradictory consent approach" is broken .................................................................................. 18

VIII.   Seizing on a characterization in Google's motion, the district court holds an evidentiary hearing on whether the data transmissions are "browser agnostic." ........................... 20

IX.   The district court grants Google's motion, finding as a matter of law that the plaintiffs consented. ........................... 22

Summary of argument ........................................................... 25

Standard of review ................................................................ 27

Argument ............................................................................. 28

I.   The district court erred in holding, as a matter of law, that Chrome users consented to Chrome sending their personal information to Google. ........................................ 28

A.   To secure consent, a company must establish that it unambiguously disclosed to users that it intended to engage in the specific practice at issue. ...................... 29

B.   Google did not show that a reasonable user would have unambiguously understood that Chrome would send their personal information to Google even if they decided not to sync their accounts. ...................... 32

C.   The district court's contrary conclusion failed to properly consider how a reasonable Chrome user would have understood Google's disclosures. ........................... 41

II.   At a minimum, disputed issues of fact precluded the district court from resolving the issue of consent at summary judgment. ........................................................... 48

Conclusion ........................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................. 53

*Animal Legal Defense Fund v. FDA,*
    836 F.3d 987 (9th Cir. 2016)................................................ 54

*Arato v. Avedon,*
    5 Cal. 4th 1172 (1993)......................................................... 50

*Brown v. Google LLC,*
    2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) ............... 7, 44, 45

*Brown v. Google LLC,*
    525 F. Supp. 3d 1049 (N.D. Cal. 2021)............................... 29

*Campbell v. Facebook Inc.,*
    77 F. Supp. 3d 836 (N.D. Cal. 2014)................................... 29

*Clarkson v. Alaska Airlines, Inc.,*
    59 F.4th 424 (9th Cir. 2023) ............................................... 28

*Davis v. Bud & Papa, Inc.,*
    885 F. Supp. 2d 85 (D.D.C. 2012) ...................................... 49

*Entrepreneur Media, Inc. v. Smith,*
    279 F.3d 1135 (9th Cir. 2002).............................................. 53

*Harris v. County of Orange,*
    682 F.3d 1126 (9th Cir. 2012).............................................. 22

*In re Facebook, Inc. Internet Tracking Litigation,*
    956 F.3d 589 (9th Cir. 2020)........................................... 25, 30

*In re Facebook, Inc., Consumer Privacy User Profile Litigation,*
    402 F. Supp. 3d 767 (N.D. Cal. 2019)........................... passim

*In re Google Assistant Privacy Litigation,*
    457 F. Supp. 3d 797 (N.D. Cal. 2020)................................. 29

*In re Google Inc. Gmail Litigation,*
    2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ...................................................... 30

*In re Google Location History Litigation,*
    428 F. Supp. 3d 185 (N.D. Cal. 2019) ................................................................ 35, 49

*In re Google RTB Consumer Privacy Litigation,*
    606 F. Supp. 3d 935 (N.D. Cal. 2022) ...................................................................... 43

*In re Meta Pixel Healthcare Litigation,*
    2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) ............................................... 30, 34

*Lopez v. Apple, Inc.,*
    519 F. Supp. 3d 672 (N.D. Cal. 2021) ...................................................................... 35

*McCoy v. Alphabet, Inc.,*
    2021 WL 405816 (N.D. Cal. Feb. 2, 2021) ............................................................. 30

*Opperman v. Path, Inc.,*
    205 F. Supp. 3d 1064 (N.D. Cal. 2016) ................................................ 30, 32, 35, 49

*Perkins v. LinkedIn Corp.,*
    53 F. Supp. 3d 1190 (N.D. Cal. 2014) ............................................................... 30, 47

*Quintanilla v. Dunkelman,*
    133 Cal. App. 4th 95 (2005) ........................................................................... 27, 50

*Schweitzer v. Comenity Bank,*
    866 F.3d 1273 (11th Cir. 2017) ............................................................................. 31

*Scudder v. Perce,*
    159 Cal. 429 (1911) ................................................................................................ 36

*Smith v. Facebook, Inc.,*
    262 F. Supp. 3d 943 (N.D. Cal. 2017) ............................................................. 29, 47

*Smith v. Facebook, Inc.,*
    745 F. App'x 8 (9th Cir. 2018) ......................................................................... 47, 48

*Southern California Gas Co. v. City of Santa Ana,*
    336 F.3d 885 (9th Cir. 2003) .................................................................................. 36

*Tsao v. Desert Palace, Inc.*,
  698 F.3d 1128 (9th Cir. 2012)......................................................................... *passim*

*Van Patten v. Vertical Fitness Group, LLC*,
  847 F.3d 1037 (9th Cir. 2017)................................................................. 29

*Watkins v. L.M. Berry & Co.*,
  704 F.2d 577 (11th Cir. 1983)........................................................... 31, 32

*Zaratzian v. Abadir*,
  2014 WL 4467919 (S.D.N.Y. Sept. 2, 2014) ....................................... 32

*Zetwick v. County of Yolo*,
  850 F.3d 436 (9th Cir. 2017)................................................................. 56

## Statutes

28 U.S.C. § 1291 ........................................................................................... 5

28 U.S.C. § 1331 ........................................................................................... 5

Cal. Civ. Code § 1798.140............................................................................ 8

Cal. Civ. Code § 3534................................................................................. 36

## Other Authorities

Restatement (Second) of Torts (1979) ............................................... *passim*

# INTRODUCTION

This appeal is about clear, broken promises that Google made to users of its popular web browser, Chrome. The first promise was that "you don't need to provide any personal information to use Chrome." The second was that any personal information that *was* provided while using Chrome "won't be sent to Google unless you choose to store that data in your Google Account by turning on sync"—an optional Chrome "mode" that is disabled by default.

As it turns out, however, Chrome did secretly send users' personal information to Google—*regardless* of whether the "sync" mode was turned on or off. These data transmissions are detailed and intrusive: They reveal to Google the content of communications that users exchange online and information that they submit to others—from unemployment-benefit applications to political activities. And the amount of data is astonishing: Google produced ███████████ files on just the six named plaintiffs here—and that is only a fraction of what the company has actually collected about them. Google undertakes all of this surveillance for a single purpose: to better finetune its extremely profitable ad-targeting business.

Remarkably, Google has never disputed in this litigation that Chrome sends this information to the company, despite the company's direct promises to the contrary. Instead, Google asserts that its express promises don't matter because other statements in its terms of service and privacy policies generally state that Google collects data

1

about users when browsing the internet. In the company's view, these generalized and vague statements somehow trump its more specific Chrome-related promises. As a result, the company contends, Chrome users have expressly consented to the secret transmission of their personal information—a categorical defense to any claim that Google violated users' privacy or breached its contracts.

Google's approach clashes with fundamental principles of consent. Although consent can be a defense to tort claims, "[t]o be effective, consent must be . . . to the particular conduct, or substantially the same conduct." Restatement (Second) of Torts § 892A(2)(b) (1979); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012). And, in the data-privacy context, this inquiry is conducted from the vantage point of an ordinary, reasonable user. So, to establish consent based on a company's disclosures, the company must show that a reasonable user would have understood from those disclosures that the company would engage in the specific conduct at issue. But, if a reasonable user "could plausibly have interpreted the contract language as *not* disclosing that [the defendant] would engage in particular conduct," then the disclosures are insufficient to establish consent. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019).

Based on the disclosures here, a reasonable user would never have understood that Chrome sends users' personal information to Google if they did not choose to "sync" their Chrome browser with their Google account. Indeed, all of the record

evidence pointed to this conclusion. To start, as already mentioned, Google's Chrome-specific privacy notice promised that personal information would not be sent to the company "unless" sync was turned on. Even Google's preferred generalized terms and policies directed users to these Chrome-specific terms, which expressly "govern" in the event of a conflict. Leading privacy and consumer-behavior experts also confirmed that reasonable users would understand Google's Chrome-specific privacy promises to have meant what they said.

But, most damning of all, Google's *own* executives and engineers—including the very one leading the Chrome team—believed that the browser "never" sent users' "browsing history and other personal information" to Google "after sync is turned off." Google's own employees, in other words, did not understand the company's privacy policies to clearly disclose that Chrome sent users' information to Google without sync being turned on. So how could an ordinary user? To the contrary, the company's own internal analyses, based on dozens of stakeholders, concluded that Google's "broad and contradictory consent approach" "ma[de] it difficult for people to understand how we use their data in all circumstances."

Despite all this, the district court here granted summary judgment to Google on its consent defense—meaning that it concluded, as a matter of law, that the company's disclosures unambiguously informed a reasonable user that Chrome sent their personal information to Google regardless of sync status. To reach this conclusion,

the court adopted a novel consent framework that turned not on a reasonable user's expectations, but on the technical (and largely non-public) details of how Chrome transmitted the data to Google as compared to *other* browsers. Independently reviewing these details, the district court found, on a contested record, that most of the data transmissions here were "browser-agnostic"—that they occurred regardless of whether the user browsed on Chrome or any other browser. Based on this finding, it held that, because the "at-issue data" did not depend on the user's browser, the only relevant disclosures were Google's generalized statements about its privacy practices and data collection. So the court simply disregarded the Chrome-specific promises, as well as record evidence confirming that reasonable users believed these promises.

The district court's approach to consent—which elevates behind-the-scenes technicalities over users' expectations—is untenable on multiple levels. Its holding cannot be reconciled with longstanding, black-letter tort principles. It tramples on the jury's traditional role in resolving questions about the existence and scope of consent. And, if accepted, the district court's logic would allow companies to obtain consent for all sorts of intrusive and unexpected privacy practices merely by obfuscating the mechanics behind those practices—details that, in this age of highly complex and specialized technologies, would be far beyond the comprehension of ordinary (and even many sophisticated) users.

Finally, even on its own terms, the decision below cannot be sustained. The question whether the data transmissions here were in fact "browser-agnostic" was highly disputed. And, in related litigation about Chrome privacy practices, Google's primary expert testified—contrary to his testimony below—that "the user's choice of browser will impact data transmissions to Google domains." So, even if the district court's unusual consent methodology was correct (and it is not), it still erred in finding that there were no triable issues of fact on the consent question. The decision below should therefore be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332(d), and 1367. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court granted Google's motion for summary judgment and entered final judgment on December 12, 2022. 1-ER-4, 1-ER-3. The plaintiffs filed their timely notice of appeal on December 20, 2022. 2-ER-35.

## STATEMENT OF THE ISSUE

1. Did the district court err in concluding as a matter of law that, despite Google's express promise to not send Chrome users' personal information to Google unless they chose to turn on sync, a reasonable Chrome user would have nonetheless understood that they had provided consent to send their personal information to Google when using Chrome without turning on sync?

## STATEMENT OF THE CASE

**I.     Google expressly promises Chrome users that it will not send their personal information to Google unless they choose to "sync" their browser with their Google accounts.**

Google Chrome is the most widely used web browser in the world. 8-ER-1581. In the United States, nearly half of all internet users rely on Chrome to browse the web on their computers, tablets, and smartphones. *Id.*[1]

Google's Terms of Service direct Chrome users to a policy called the "Chrome Privacy Notice" to "[l]earn how to control the information that's collected, stored, and shared when [users] use the Google Chrome browser." 3-ER-357-58. In that policy, Google categorically assures Chrome users that they "don't need to provide any personal information to use Chrome." 3-ER-357. Although Chrome stores all user information "locally on [the user's] system"—including "[p]ersonal information," web "browsing history," and "cookies" or other data from third-party websites—the Chrome Privacy Notice assures users that this information "won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." 3-ER-358.

Turning on Chrome's "Sync" mode, however, triggers entirely different privacy practices. As the Chrome Privacy Notice explains: "When you sign in to the Chrome browser . . . and enable sync with your Google Account, your personal information is

---

[1] All internal citations, quotation marks, and alterations are omitted unless otherwise indicated.

6

saved in your Google Account . . . so you may access it when you sign in and sync to Chrome on other computers and devices." 3-ER-362. By enabling sync, the Chrome Privacy Notice continues, users grant Google permission to "use your browsing data to improve and personalize your experience within Chrome" as well as on "other Google products." 3-ER-363.

But the Chrome Privacy Notice assures all users that "[s]ync is only enabled if you choose." 3-ER-363.[2] "If you don't use your Chrome data to personalize your Google experience outside of Chrome," Google promises it "will only use your Chrome data after it's anonymized and aggregated with data from other users. 3-ER-363.[3]

## II. Chrome secretly sends the data of the plaintiffs and millions of other users who did not sync to Google, which uses it to build detailed user profiles and to sell personalized ads.

The Chrome promises are false. Contrary to the Chrome Privacy Notice's express terms, Chrome sends detailed, personal information about *every* user to

---

[2] Chrome offers another privacy-enhancing mode, known as "incognito" mode. *See* 3-ER-397 n.1. In a related case, *Brown v. Google LLC*, Chrome users challenged Google's collection of data about them while using incognito mode, and Google asserted nearly an identical consent defense as the one it presents here. The district court in *Brown* denied Google's motion for summary judgment on consent. *See Brown v. Google LLC*, 2023 WL 5029899, at *7-*9 (N.D. Cal. Aug. 7, 2023).

[3] This accords with other similar promises Google made to its users. *See* 3-ER-327, 332.

Google, regardless of whether they enabled sync. Google then monetizes this information, creating comprehensive user profiles that enable the company's continuous surveillance of users—all to more effectively personalize and target ads.

The personal information that Chrome sends to Google falls into several categories. Specifically, Chrome sends the following information to Google regardless of sync status:

- **IP addresses and user-agent information:** Numbers that identify a device connected to the internet, which Google can associate with a particular internet user. 8-ER-1388-91, 1400.

- **Cookies:** Small text files that Google places on a user's browser to, among other things, record and track an individual user's interactions and communications across the internet. 8-ER-1391-94, 1401-03.

- **Browsing history information:** This includes detailed full-string URLs of specific communications, users' search queries, button-click text, and form submissions. 8-ER-1399.

- **X-client data headers:** A Google identifier that is unique to Chrome and that, in combination with other information, uniquely identifies every individual version of the Chrome browser. It cannot be blocked or removed, and is described internally by Google as a "real fingerprint" that can be used to track individual users across the web. 6-ER-1072; *see also* 6-ER-1066; 8-ER-1405-06.

There is no dispute that each of these categories qualifies as "personal information" under California law, which governs Google's terms. 3-ER-410-11; *see* Cal. Civ. Code § 1798.140 (defining personal information as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer," including

"browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement").

Chrome sends the above categories of data to Google every time a user (1) types into the Chrome toolbar, or (2) exchanges a communication with a website on which Google source code is present, regardless of whether the website is a Google property (i.e., the overwhelming majority of popular websites). Dkt. 461-4 at 9 (citing record). As Google admits, these transmissions occur regardless of whether the Chrome user chooses to sync or not. Google then uses a number of tools to connect this information with specific users. For example, the company sends not-synced data to the ████ ████████, a secret internal system that Google admits ███████████ ███████████████████████████████████████████████████████████ ██████████████████████████ 6-ER-1017-18; *see also* 5-ER-879; 7-ER-1370-71. Google re-directs the information that Chrome sends about not-synced users in a backend database called ██████████ described internally as ███████████ ██████████████████ 6-ER-1070 (emphasis added). Google also uses a system called ██████████ to obtain "a single view of a user on the same device and across different devices," linking their identifiers and browsing history from Chrome across devices even when they are not synced or signed in. 5-ER-910. As a result, Google is able to compile detailed profiles on users encompassing thousands of data points, including sensitive and personal information related to race, gender, religion,

nationality, sexual orientation, health, political beliefs, and sexual interests. 5-ER-796-869.

The amount of personal information about users that Chrome sends to Google is staggering. For example, the Chrome-based personal information that Google produced for just the six named plaintiffs—all of whom did not choose to sync when using Chrome—consisted of ███████████ files exceeding ███████. 7-ER-1234.[4] And that is just a fraction of the information that Google has on the plaintiffs; as the magistrate judge observed, "given the enormous quantity of data collected by Google on a daily basis, . . . under no circumstance would there have existed a 'complete picture' of every instance where data was collected regarding Named Plaintiffs." 4-ER-622.

The purpose of these user profiles—and all of Google's other tracking and data-collection efforts—is to further the company's primary source of revenue: advertising. In 2016, for example, nearly 90 percent of Google's revenue came from its targeted-advertising programs. 8-ER-1589. Google's comprehensive user profiles allow the company to dynamically target individuals with highly personalized ads. This personal data has real market value; a 2015 article estimated that the commercial value of a single internet user's data varied from more than $15 to $40. 8-ER-1583; *see*

---

[4] Although the named plaintiffs each testified that they also used other browsers, ████████████████████████████████████████████ 4-ER-456.

8-ER-1586, 1589. And Google itself has internally estimated that it would lose at least ███ in Google Ads alone if it lost access to personal information via third-party cookies in Chrome. *See* 5-ER-660-64 (noting this and predicting a ██ drop in ad revenue if Google were to lose access to personal information via third-party cookies).

## III. After the plaintiffs file this case, Google argues that they consented to the data transmissions based on general language in Google's non-Chrome-specific Privacy Policy.

The plaintiffs in this case are Chrome users who chose not to sync their browsers with their Google accounts. Nevertheless, Chrome sent Google personal information about the plaintiffs and their internet browsing—including sensitive information relating to applications for unemployment benefits and political activities. 8-ER-1567-80. So the plaintiffs filed this action to remedy the harm they and other Chrome users suffered as a result of Google's violations of their privacy. They alleged a number of claims under federal and state privacy laws, as well as contract and other statutory claims.

Google moved to dismiss the claims. Dkt. 57. The company never denied that it tracked Chrome users and collected their data even when they did not sync their browser with their Google accounts. *Id.* at 5-7. Instead, it contended that this didn't matter because—despite the Chrome Privacy Notice's assurances that no data would be sent to Google unless synced—the plaintiffs had somehow "consented" to these secret data transmissions. *Id.* at 9.

11

To support its consent defense, Google pointed to its general Privacy Policy. Google claimed that this policy established consent for Chrome to send not-synced users' personal information to Google based on this statement: "We collect information about your activity in our services, which we use to do things like recommend a YouTube video you might like. The activity information we collect may include . . . [a]ctivity on third-party sites and apps that use our services [and] Chrome browsing history you've synced with your Google Account." 3-ER-328.

In their opposition, the plaintiffs argued that the Privacy Policy's generalized disclosures could not trump the express promises that Google made to Chrome users in the Chrome Privacy Notice. Dkt. 67. That was particularly so because Google's terms of service expressly provided that "service-specific additional terms"—including the Chrome Privacy Notice—"govern" in the event of any conflict. 3-ER-383; *see* Dkt. 67 at 6 n.4.

But more importantly, they explained, the Privacy Policy actually reinforces the Chrome Privacy Notice's express promises to users. Dkt. 67 at 1, 6. In fact, the policy specifically hyperlinks to the Chrome Privacy Notice and tells readers to click on that link for "additional information" about Chrome. 3-ER-343. The Privacy Policy reiterates several times that "[y]our Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account." 3-ER-346; *see also* 3-ER-328, 350. It provides that services like Chrome "may share

information about your activity with Google and, depending on your account settings and the products in use . . ., this data may be associated with your personal information." 3-ER-350. And, more broadly, it reminds users that "[t]he information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls." 3-ER-327; *see also* 3-ER-326 (explaining that "across our services, you can adjust your privacy settings to control what we collect and how your information is used").

## IV. Judge Koh rejects Google's consent defense, concluding that a reasonable jury could find that the plaintiffs did not consent to having their data sent to the company.

In its order on the motion to dismiss, the district court (Judge Koh) agreed with the plaintiffs about consent. It first explained that, because consent is an affirmative defense, Google carries the burden of proof. 3-ER-407. So, to establish actual consent, Google had to show both that its "disclosures [] explicitly notif[ied] users of the practice at issue" and that these disclosures "have only one plausible interpretation." 3-ER-407-08.

The district court then found that Google was unable to make this showing. Based on Google's disclosures, the court concluded, "a reasonable user could have concluded that if he or she used Chrome without sync, his or her personal information would not be sent to Google." 3-ER-410. In particular, the court noted that the Chrome Privacy Notice made several "specific representations that could suggest to a

reasonable user that Google would not engage in the alleged data collection," including: (1) "You don't need to provide any personal information to use Chrome"; and (2) "The personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google account by turning on sync." 3-ER-409-10. Because "Google's representations might have led a reasonable user to believe that Google did not collect his or her personal information when the user was not synced," the court concluded that "Google cannot show that Plaintiffs expressly consented to Google's collection of data." 3-ER-412.

The court also found that Google's "general disclosure" in its Privacy Policy was "insufficient" to establish consent. 3-ER-409. "[N]either Google's Privacy Policy nor any other disclosure to which Google points," the court observed, "states that Google engages in the alleged data collection while users are using Chrome without sync." 3-ER-413. "To the contrary, Google's disclosures state that the data will *not* be sent to Google when users use Chrome without sync." *Id.* (emphasis added).

## V. Discovery confirms that reasonable Chrome users would not expect their personal information to be sent to Google without syncing their accounts.

The evidence produced during discovery confirmed what Judge Koh held: No reasonable Chrome user would understand, based on Google's disclosures, that Chrome could send their personal information to Google even with sync turned off.

In fact, Google's own employees who worked on Chrome shared this understanding. For example, Chrome's lead product manager Sabine Borsay testified

that the browser "never" sent users' "browsing history and other personal information" to Google "after sync is turned off." 4-ER-494-96 (stating that she was "the product manager for Chrome Sync," and therefore would "know how [her] product works"). But, as Google admitted numerous times in this litigation, Chrome does send such information to Chrome—regardless of sync status. The head of Chrome Trust & Safety also believed that Chrome would not transmit personal information for not-synced users. *See* 6-ER-1104, 1111; *see also* 6-ER-1108-10 (testifying that, other than X-client data, Chrome does not send any information to Google for users operating Chrome under the default—i.e., not-synced—setting). And an internal presentation on "[r]ethinking Chrome history sync and our history data usage policies" expressed concerns that "the current set of consents around how Chrome history may be used do not provide any clear view of how [a] user's data may be used, and [] needs a significant amount of improvements to [] achieve real transparency." 5-ER-777, 783.

The plaintiffs' expert evidence confirmed these concerns. Professor Joseph Turow, a leading privacy scholar at the University of Pennsylvania, opined that a reasonable Chrome user, when reading the Privacy Policy, Chrome Privacy Notice, and other disclosures together, would likely understand them to mean that Chrome does not send personal information to Google unless synced with a Google account. 7-ER-1306-14. Professor Leslie John, a behavioral scientist at Harvard Business School who studies privacy decision-making, similarly explained that consumers—

15

whether they read Google's privacy policies or not—could reasonably believe that Chrome would not send their personal information to Google when using Chrome "in the not-synced state." 5-ER-703-06.

This was all consistent with Google's broader internal analyses of the company's consent process and its shortcomings. As one report explained, Google's "broad and contradictory consent approach leads to people not understanding how we're collecting or using data - which means they're not actually making informed decisions about how they engage with Google." 5-ER-748. And despite the clear promises in the Chrome Privacy Notice, key company insiders recognized that Google was simply "not in a position" to promise not-synced Chrome users that their "browsing data" would "never [be] used" for commercial purposes, or that it would "never [be] shared with others" absent the user's "explicit[]" permission, or that "[t]racking is off by default." 5-ER-773.

## VI. Google moves for summary judgment on its consent defense.

While discovery was still ongoing, Google moved for summary judgment solely on its affirmative defense of consent. Dkt. 395. It reiterated the primary themes from its motion to dismiss: It did not deny that Chrome sends Google information about every user—whether synced or not—but it claimed that the company's general Privacy Policy sufficiently disclosed this practice. *Id.* at 3-6. And the company effectively disregarded the express promises it made to users in the Chrome Privacy Notice,

asserting that they didn't matter because there was no evidence that the plaintiffs had read them. *Id.* at 12-13, 17-18.

Google also identified two additional pop-up screens that it claimed supported its consent defense. The first was the "New Account Creation agreement," which appeared on the screen of users who created a new Google account after June 2016. 6-ER-1150. The first two sentences of the screen tell users that, "[b]y choosing 'I agree' below you agree to Google's Terms of Services" and its "Privacy Policy"—both of which, as described above, specifically incorporate the Chrome Privacy Notice. *Id.* And, when discussing the data it collects, the screen reiterates the Chrome Privacy Notice's promises by highlighting that "*[d]epending on your account settings*, some of this data may be associated with your Google Account and . . . treat[ed] . . . as personal information." *Id.* (emphasis added); *see also* 6-ER-1159 (reassuring users that, via the Web & App Activity setting, their "Chrome history" will only be "saved in [their] Google Account . . . if Chrome Sync is on").

The next pop-up, a so-called "Consent Bump," appeared without prompting on the screens of users who had created their Google accounts *before* June 2016. 6-ER-1139.The purpose of the pop-up, according to the Google, was to inform users that Google had "introduced some optional features for your account, giving you more control over the data Google collects and how it's used, while allowing Google to show you more relevant ads." *Id.* The pop-up stated that "[m]ore information will be

17

available in your Google Account, making it easier for you to review and control" and explained that, with the change, "[y]ou can find and control . . . Search and YouTube . . . data – things like what you've searched for and videos you've watched" in My Account. *Id.* In a separate paragraph, it then said that the setting "may also include browsing data from Chrome and activity from sites and apps that partner with Google." *Id.* The pop-up also reaffirmed that two key promises will stay "the same": (1) "Google does not sell your personal information to anyone"; and (2) "You control the types of information we collect and use." *Id.*; *see also id.* (noting that users could control their data collection through the "Web & App Activity setting," which only saves Chrome history if "Sync is on"). The pop-up provided no obvious option for users to "cancel" or otherwise decline the new features. *Id.*

## VII. After discovery closes, Google is sanctioned for improperly withholding internal documents revealing that the company's "contradictory consent approach" is broken.

In the course of discovery, the plaintiffs learned that Google had authorized a secret internal initiative—known as ██████████—to evaluate possible ways to improve privacy. 4-ER-624. Part of this initiative involved more than twenty interviews with senior Google executives and engineers about the company's "consent flow"—the process, policies, and disclosures through which Google supposedly secured consent from users. The ██████████ team gathered these interview notes into a single

confidential document and drafted a final, confidential white paper making recommendations based on the results. 4-ER-626.

The white paper's conclusions were unsparing: "Our research analysis and stakeholder interviews have shown that Google's **consent approach**, enabling the broad collection and use of personal data, is a root cause for our systemic privacy challenges." 4-ER-502 (emphasis in original). The paper continued: "Our approach has become out-of-step with user expectations and regulation. It makes it difficult for people to understand how we use their data in all circumstances, to make the right choices for them, and for us to take clear positions and distinguish ourselves among competitors." *Id.*

The interview notes were even more damning: "At Google, we still seem to believe in that fantasy that users agreed to this." 4-ER-627. Without exception, the "conversations that the ███████ team ha[d] with stakeholders across Google" revealed that the company's consent flow was hopelessly broken. 4-ER-507. As one interviewee explained, there is "no coherent and simple access to privacy controls across all apps, in Chrome and Android." 4-ER-630. Another summed it up more simply: "If people were the deciders, they wouldn't take the deal, but they are not the deciders." 4-ER-627.

Despite their obvious relevance, Google withheld the key final ███████ documents during discovery. And when the plaintiffs cited to some of the drafts from

the ████████ projects that the company *had* produced, Google claimed that the plaintiffs were relying merely on "internal discussions by a handful of more than 150,000 people employed by Google." 4-ER-625; *see also id.* (describing the documents as simply "the author's scratchpad notes"). But it eventually became clear that this was false: ████████████ was ██████████████████████ ██████████████████████████████████████████████████████ .

. . that was beg[u]n by a company vice-president" and was reviewed by senior executives. 4-ER-626.

The plaintiffs moved for sanctions. After a lengthy hearing, the magistrate judge found that Google committed discovery misconduct by failing to timely produce the ████████████ white paper and interview notes. 4-ER-630-32. As a sanction, the magistrate judge prohibited Google from objecting to the admissibility or use of the documents at any stage in the case. 4-ER-637-38.

## VIII. Seizing on a characterization in Google's motion, the district court holds an evidentiary hearing on whether the data transmissions are "browser agnostic."

During the summary-judgment briefing, Judge Koh was elevated to this Court, and this case was re-assigned to Judge Gonzalez Rogers. In its summary-judgment motion, Google had passingly characterized the data transmissions at issue as "browser-agnostic," meaning that they purportedly were the same regardless of the user's browser. Dkt. 395 at 4, 17. This characterization was not only irrelevant to

Chrome users' consent, the plaintiffs explained, but also false: "Chrome sends more personal information to Google than other browsers." Dkt. 461-4 at 10.

Nevertheless, during the summary-judgment hearing, Judge Gonzalez Rogers posed several questions to counsel about whether the data sent to Google from Chrome was in fact "the same" as data sent from other browsers. 2-ER-57-62. After that hearing, she issued an order setting an evidentiary hearing on the specific question of "whether the collection of the at-issue data is 'browser-agnostic'"—an issue that had featured only sparingly in the parties' briefing. 2-ER-321-22.

The evidentiary hearing established that the personal information sent from Chrome to Google was "quantitatively" and "qualitatively" different compared with other browsers. 2-ER-315-16; 1-ER-18. To start, as Google itself admitted, only Chrome sends Google the X-client identifier. 2-ER-183-84; 1-ER-19. And that identifier, as explained above, is a "real fingerprint" that by itself allows Google to track individual users across the internet. 6-ER-1008-1068, 1072.

The plaintiffs' expert also testified that the amount, depth, and detail of the information that Chrome sent to Google about users' IP addresses, user agents, browsing history, and cookies was substantially higher than that sent by other browsers. 4-ER-456-57, 478-88; *see also* 2-ER-242 (Google's 30b(6) witness testifying that "every major browser handles cookies differently" and that "no two browsers have the same behavior"). Google's primary expert Georgios Zervas did not contest this: He testified

only that, apart from the X-client identifier, other browsers sent the same "categories" of data to Google as Chrome. 2-ER-99, 105.[5]

## IX. The district court grants Google's motion, finding as a matter of law that the plaintiffs consented.

The unexpected evidentiary-hearing order foreshadowed the district court's ruling on summary judgment—which centered on the premise that the "data at issue" was "browser-agnostic." 1-ER-16.

The court began by reciting the correct background principles: (1) Consent is an affirmative defense for which Google carries the burden; (2) the user's consent must be "actual," meaning that "the disclosures must explicitly notify users of the conduct at issue"; and (3) Google must not have "exceed[ed]" the "scope" of that consent. 1-ER-15-16. But the court's focus swiftly shifted from these legal principles to the question of "which agreement controls the at-issue data collection." 1-ER-16. And that question, the court concluded, was resolved entirely by its finding that there

---

[5] Notably, Dr. Zervas has testified elsewhere that, "[w]hile the core functionality of most modern browsers is the same, browsers may differ in their default settings." Declaration of Georgios Zervas at 85-86, *Doe v. Google* (N.D. Cal. Aug. 3, 2023) (No. 3:23-cv-02431-VC). As a result, he observed, "even without modifying browser settings, the user's choice of browser will impact data transmissions to Google domains." *Id.* This Court can take judicial notice of this publicly filed declaration. *See Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (holding that the Court "may take judicial notice of undisputed matters of public record," which "include[es] documents on file in federal or state courts" like "declaration[s]).

was "no dispute . . . that the collection of the at-issue data, except for the X-client-data identifier, is browser-agnostic." 1-ER-18.[6]

The rest of the court's analysis flowed from this determination. Because "the at-issue data collected is not specific to Chrome," the court reasoned, "Google's general policies apply." 1-ER-19. The district court found that those policies—the general Privacy Policy, the New Account Creation Agreement, and the Consent Bump—disclosed that Google collects users' personal information. 1-ER-20-23.[7] So it concluded that "a reasonable person viewing those disclosures would understand that Google maintains the practices of (a) collecting its users' data when users use Google services or third-party sites that use Google's services and (b) that Google uses the data for advertising purposes," and therefore "would understand that Google combines and links this information across sites and services for targeted advertising purposes." 1-ER-25.[8]

---

[6] Of course, as explained above, there was a factual dispute on this point: Even if the categories of data transmitted were the same across browsers, the actual amount and detail of the data transmitted was critically different. But the district court believed that the data's "quantity and its use" was irrelevant. 1-ER-18.

[7] It also concluded that the Chrome Privacy Notice's section on "[f]ield trials" adequately disclosed the company's use of the X-client data. 1-ER-23.

[8] The court tersely rejected the plaintiffs' argument that "the extent and scope of Google's actual collection and use grossly exceed the scope of conduct disclosed," because it found that this conduct was not alleged in the complaint. 1-ER-26. The court did not explain why that mattered given that consent was *Google's* affirmative defense to the plaintiffs' claims.

The court then dismissed the express promises that the Chrome Privacy Notice made to users. 1-ER-9. Inverting the proper burden of proof, the court asked instead whether the plaintiffs' "consent [wa]s negated by their acceptance of the Chrome Privacy Notice." 1-ER-27. In its view, because "the at-issue data is not specific to Chrome," these promises didn't control; so "[c]onsent [wa]s not negated." 1-ER-28.

Finally, the court refused to credit the evidence that Google executives and engineers believed the company's consent framework was contradictory and "broken." 1-ER-28-30. The court critiqued the plaintiffs for introducing "undated, untitled" and "draft" documents from the ██████████ project—the only versions that Google produced before the end of discovery. 1-ER-28-29. But, at the same time, the court denied the plaintiffs' motion to supplement the record with the final ██████████ documents that Google had improperly withheld during discovery, based on the circular reasoning that "[t]he evidence plaintiffs seek to proffer is similar to evidence that already exists in this case"—even though it had excluded that evidence from consideration. 1-ER-4-5 n.2. So the court simply didn't consider whether this evidence—showing that Googlers themselves were concerned that users wouldn't understand the Chrome consent "flow"—established even a genuine dispute about whether a reasonable user would have believed they had consented to Chrome sending detailed personal information about them to Google.

## SUMMARY OF ARGUMENT

**I.A.** To secure consent in the data-privacy context, a company like Google bears the burden of demonstrating that its disclosures unambiguously alerted an objectively reasonable user to the specific privacy practices at issue. Under that standard, there is no blanket version of consent. Instead, the "relevant question" is whether a user would "reasonably expect," based on the disclosures, that a company would engage in particular conduct. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020). If that user could have plausibly understood the disclosures "as not disclosing that [the defendant] would engage in particular conduct," then the disclosures are insufficient to establish consent. *Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 789.

**B.** Google came nowhere close to satisfying this strict standard. It is undisputed that Google repeatedly promised Chrome users—in a document specifically titled the "Chrome Privacy Notice"—that their personal information "won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." And all of the other record evidence—including Google executives' and engineers' own understanding of the company's data-collection practices and the plaintiffs' expert testimony—confirmed what the disclosures made clear. As a result, an objectively reasonable user reading these representations could easily conclude, as Judge Koh

sensibly had before this case was transferred, "that Google did not collect his or her personal information when the user was not synced." 3-ER-412.

**C.** The district court, however, held that *no* reasonable jury could find that *any* reasonable user would take Google at its word—and therefore that every reasonable Chrome user expressly consented to having highly sensitive personal information sent to Google. But to reach this conclusion, the district court adopted a novel consent framework that turned not on user expectations, but on the technical details of how Chrome transmitted the data to Google when compared to other browsers—details that no reasonable user would likely ever know. And then, based solely on the erroneous factual premise that the data transmissions here were "browser-agnostic," the district court effectively ignored Google's Chrome-specific promises in favor of the company's broad statements about how it generally collects data. That approach—which makes behind-the-scenes operations and mechanics the primary focus of the consent inquiry—cannot be reconciled with the governing reasonable-user standard.

**II.** The district court's summary-judgment ruling also fundamentally usurped the role that a jury is expected to play when it comes to consent. As this Court has made clear, consent is a question "normally for the trier of fact to determine." *Tsao*, 698 F.3d at 1149. That makes sense. Determining whether a defendant's affirmative disclosures regarding its data-collection practices would be sufficient to secure informed consent from a reasonable user involves "a peculiarly fact-bound assessment

which juries are especially well-suited to make." *Quintanilla v. Dunkelman*, 133 Cal. App. 4th 95, 115 (2005).

The district court erred by taking the issue of consent away from the jury. It refused to credit the plaintiffs' evidence, repeatedly drew factual inferences in Google's favor, and even affirmatively disregarded key evidence on the theory that the evidence was either irrelevant or not credible or persuasive enough. And even on the question it thought was relevant—whether the data transmissions to Google at issue here were technically "browser-agnostic"—the district court impermissibly resolved obvious factual disputes.

Ultimately, the district court lost sight that the question at the heart of this case is what a *reasonable user* would expect when reading Google's promises—not what a federal judge understands about it after discovery is complete and after holding an hours-long evidentiary hearing on the underlying technical details. The district court did not even try to explain how an ordinary user would have any idea about how their personal information was actually communicated to Google. Because it is for a jury—not the district court—to make that determination, this Court should reverse.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's summary judgment ruling to determine whether there are any genuine disputes of material fact and whether the

district court correctly applied the relevant substantive law." *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 432 (9th Cir. 2023).

## ARGUMENT

**I.      The district court erred in holding, as a matter of law, that Chrome users consented to Chrome sending their personal information to Google.**

Google does not deny that it promises Chrome users that their personal information "won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." Nor does Google dispute that the data at issue—detailed user identifiers, browsing histories, and cookies tracking web users' every online interaction—is highly personal information to which consumers have a reasonable expectation of privacy. But as Google admits, Chrome does send this information to the company regardless of whether a Chrome user turned on sync.

So the only question before this Court is whether Google established that the plaintiffs actually agreed to Chrome's secret data transmissions. Disregarding the testimony of privacy experts and Google's own internal conclusions, the district court held as a matter of law that the plaintiffs had consented. That cannot be squared with the evidence, which shows that no reasonable Chrome user would understand that their browser could send their personal information to the company even with the sync function turned off. At the very least, the plaintiffs established genuine disputes of material facts precluding resolution of Google's consent defense at the summary-judgment stage. This Court should reverse.

**A.** **To secure consent, a company must establish that it unambiguously disclosed to users that it intended to engage in the specific practice at issue.**

There is no dispute that consent is an affirmative defense to the claims against Google. *See* 1-ER-15; 3-ER-407 & n.3; *see also Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955-56 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). So, as to all claims, Google "bears the burden of proof" of establishing that the plaintiffs consented. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017); *see also, e.g., In re Pharmatrak, Inc.*, 329 F.3d 9, 19 (1st Cir. 2003); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020).

Courts within this Circuit have developed a well-accepted framework for evaluating consent in the data-privacy context. Although it can be explicit or implied, any consent must be "actual" to be effective—which means that Google's disclosures about the specific practices at issue must be unambiguous. *See, e.g., Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847-48 (N.D. Cal. 2014) (explaining that, for a finding of consent, the disclosures must have given users notice of the "specific practice" at issue); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1073 (N.D. Cal. 2016) (explaining that disclosures did not specifically notify users that their address

books would be uploaded to company's servers).[9] This "actual consent" requirement, in other words, places the burden on Google to demonstrate that its disclosures are susceptible to only one "plausible interpretation" for a finding of consent. *See, e.g.,* *Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 794; *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10 (N.D. Cal. Dec. 22, 2022).

Further, the standard for determining whether the disclosures unambiguously alerted users to the specific practice at issue is based on an objectively reasonable user. *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014). The "relevant question" is whether such a user would "reasonably expect," based on the disclosures, that a company would engage in particular conduct. *Internet Tracking Litig.*, 956 F.3d at 602. But, if a reasonable user "could plausibly have interpreted the contract language as *not* disclosing that [the defendant] would engage in particular conduct," then the disclosures are insufficient to establish consent. *Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 789. Taken together, these standards mean that there is no blanket or generalized version of consent.

---

[9] *See also, e.g., McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *4-*6 (N.D. Cal. Feb. 2, 2021) (disclosure informing users that certain information would be collected from use of "apps that use our services" was insufficient to establish consent to collection of information from apps that don't use the company's services); *In re Google Inc. Gmail. Litig.*, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) (holding that, for consent to be actual, the disclosures must "explicitly notify" users of the practice at issue).

Background tort-law principles confirm this basic understanding. "At common law, consent is a willingness for certain conduct to occur." *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) (citing Restatement § 892A(1)). "Such willingness can be limited, i.e., restricted . . . [s]o, if an actor exceeds the consent provided, the permission granted does not protect him from liability for conduct beyond that which is allowed." *Id.* (citing Restatement § 892A(4) & cmt. h.). Relatedly, a plaintiff's consent "is confined to conduct that the plaintiff *knows* the other is engaging in with the intent of invading the plaintiff's interests." Restatement § 892A(1) cmt. a (emphasis added).

As a result, "[t]o be effective, consent must be . . . to the particular conduct, or substantially the same conduct." *Id.* § 892A(2)(b); *see Tsao*, 698 F.3d at 1149. Put simply, "consent . . . is not necessarily an all or nothing proposition; it can be limited." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983). Or, as the Restatement vividly described it, "consent to a fight with fists is not consent to an act of a very different character, such as biting off a finger, stabbing with a knife, or using brass knuckles." Restatement § 892A(2) cmt. c. That is why "[v]ery often the question whether the particular conduct is within the scope of the consent given becomes a question of degree." *Id.*

Questions concerning the existence and scope of consent are "normally for the trier of fact to determine." *Id.* cmt. d; *see, e.g., Tsao*, 698 F.3d at 1149; *Watkins*, 704

F.2d at 582; *Opperman*, 205 F. Supp. 3d at 1073; *Zaratzian v. Abadir*, 2014 WL 4467919, at *9 (S.D.N.Y. Sept. 2, 2014), *aff'd*, 694 F. App'x 822 (2d Cir. 2017). Accordingly, at the summary-judgment stage, a finding of consent is only permitted where, after viewing the facts and drawing all reasonable inferences in favor of the plaintiff, a defendant establishes that no reasonable trier of fact could conclude that a reasonable user would not have understood the disclosures to permit the practice at issue. *See Opperman*, 205 F. Supp. 3d at 1074, 1077.

**B.    Google did not show that a reasonable user would have unambiguously understood that Chrome would send their personal information to Google even if they decided not to sync their accounts.**

Google came nowhere close to satisfying that demanding standard. To the contrary, the record here shows that *no* reasonable user would have understood that Chrome sends their personal information to Google unless they turned on sync. That's not just what Google promised users in its disclosures; it's what the plaintiffs' experts—and even Google's *own* engineers—concluded as well. This evidence was more than sufficient to deny summary judgment.

**1.** Start with the disclosures themselves. As detailed above, Google affirmatively promised Chrome users that their personal information would not be sent to Google unless they agreed to sync their accounts. In fact, the key document governing users' expectations about the privacy of their personal information while using Chrome—the Chrome Privacy Notice—did so multiple times. First, it told users that "[y]ou don't

need to provide any personal information to use Chrome." 3-ER-357. Next, it promised users that a wide range of information, including browsing histories and cookies, "won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." 3-ER-358.

The Chrome Privacy Notice also made clear that such information would be sent only when users turned on sync. 3-ER-362. It was only by enabling sync, the notice explained, that users consent for Google to "use your browsing data to improve and personalize your experience within Chrome" as well as on "other Google products." 3-ER-363. And for those users opting not to enable sync, Google promised to "only use your Chrome data after its anonymized and aggregated with data from other users." *Id.*

It is not difficult to ascertain what a reasonable user would understand when confronted with these numerous and "specific representations." 3-ER-409-10. As Judge Koh found, they could lead "a reasonable user to believe that Google did not collect his or her personal information when the user was not synced." 3-ER-412. Standing alone, Judge Koh continued, these promises made it impossible for Google to establish that the plaintiff "expressly consented to Google's collection of data." *Id.*

But these promises do not stand alone. Google's other disclosures—including those that Google contends obtained consent—actually reinforced the company's promise that users' information would not be sent to Google unless "you've synced."

For example, the general Privacy Policy (Google's favorite document in this case) assures users that "[t]he information Google collects, and how that information is used, depends on how you use our services and how you manage your privacy controls." 3-ER-327. It then goes on to promise that that "[y]our Chrome browsing history is only saved to your account if you've enabled Chrome synchronization with your Google Account." 3-ER-346. And even where the Privacy Policy discloses the possibility of Chrome sharing information with Google, it says that whether this sharing occurs "depend[s] on your account settings and the products in use." 3-ER-350. Not just that: In a section titled "Related privacy practices" for "specific Google services," the Privacy Policy specifically directs users to the Chrome Privacy Notice for "additional information." 3-ER-343.

Given all of this, a reasonable user would expect that choosing not to enable sync in an "account setting" would preclude Chrome from sharing their personal information with Google. *See In re Meta Pixel*, 2022 WL 17869218, at *10 (finding consent could not be established where disclosures were susceptible of "multiple plausible interpretations"). And a reasonable user could also find that the Chrome Privacy Notice's specific promises were either consistent with or overrode the Privacy Policy's more generalized provisions. At the very least, "a reasonable jury could find that [Google's] Privacy Policy provisions do not explicitly address"—and thus do not obtain knowing consent for—the secret Chrome data transmissions at issue. *See*

*Opperman*, 205 F. Supp. 3d at 1074; *see also, e.g., In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 192 (N.D. Cal. 2019) (holding that a "jury" would have to decide "whether Plaintiffs consented to a Privacy Policy authorizing the very conduct they complain of . . . or whether Plaintiffs reasonably believed, based on [Google's] representations, that they revoked consent to geolocation storage by disabling Location History").

Google's general terms of service further undermine the company's consent defense. These terms expressly provide that "service-specific additional terms govern" in the event of any conflict with Google's generalized disclosures. 3-ER-383. And they specifically list the Chrome Privacy Notice as one of these "service-specific" terms. *Id.* Again, a Chrome user faced with this disclosure could reasonably believe that, no matter what Google said in its general terms of service or Privacy Policy, the promises in the Chrome Privacy Notice controlled. *See, e.g., Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021) (noting that a "general disclaimer is nowhere near specific and unambiguous enough"). Indeed, that is the *only* reasonable understanding under California law: "A standard rule of contract interpretation is that when provisions are inconsistent, specific terms control over general ones." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 891 (9th Cir. 2003); *see also* Cal. Civ. Code § 3534 ("Particular expressions qualify those which are general"); *Scudder v. Perce*, 159 Cal. 429, 433 (1911) ("[T]he familiar rule [is] that when general and specific provisions of

35

a contract deal with the same subject-matter, the specific provisions, if inconsistent with the general provisions, are of controlling force."). Here, by deciding that the general governed the specific, the district court turned this cornerstone of contract interpretation on its head—with no support.

Perhaps because these primary disclosures are so unhelpful to Google, the company identified—for the first time at summary judgment—two pop-up screens that it claimed supported a finding of consent. But, once again, neither of these pop-ups could be reasonably interpreted to contradict Google's clear promises in the Chrome Privacy Notice or the more generalized disclosures. These pop-up screens' generalized statements about Google's broader data-collection practices don't override the more specific statements informing Chrome users what will or won't happen when it comes to their decision to sync. To the contrary, they, too, reinforce the promise that Chrome will not send users' information to Google when sync is not turned on. The Consent Bump, for example, explicitly states that users "control[] the types of information we collect and use." 6-ER-1139. And the New Account Creation agreement specifically incorporates Google's terms of service and Privacy Policy—both of which, as discussed, in turn incorporate the Chrome Privacy Notice's service-specific terms. *See* 6-ER-1150.

**2.** The record evidence confirmed that, based on the company's disclosures, reasonable Chrome users would not expect that their personal information would be

sent to Google in the absence of syncing. And not just any evidence—this was the conclusion of many of Google's own executives and engineers in frank, internal assessments of the company's consent practices.

For starters, Google insiders admitted that Google was simply "not in a position" to promise not-synced Chrome users that their "browsing data" would "never [be] used" for commercial purposes, or that it would "never [be] shared with others" absent the user's "explicit" permission, or that "tracking is off by default." 5-ER-773. As a result, internal analyses concluded, the company's "broad and contradictory consent approach leads to people not understanding how we're collecting or using data – which means they're not actually making informed decisions about how they engage with Google." 5-ER-748. And an internal presentation specifically devoted to "[r]ethinking Chrome history sync and our history data usage policies" cautioned that "the current set of consents around how Chrome history may be used do not provide any clear view of how [a] user's data may be used, and [] needs a significant amount of improvements to [] achieve real transparency." 5-ER-777, 783.

In fact, Google's *own* employees—including those leading the company's work on Chrome and privacy—did not fully understand how Google's data-collection practices actually worked. Both Chrome's lead product manager and the head of "Chrome's Trust & Safety" team believed the browser "never" sent users' "browsing history and other personal information" to Google "after sync is turned off." 4-ER-494-

96; 6-ER-1114-21. But, of course, Google now admits that Chrome routinely sends these categories of information to the company no matter the user's sync status. As CEO Sundar Pichai stated internally, "if you don't want to share your data with Google, Chrome might not be the right browser for you." 6-ER-1090.

This lack of transparency in the Chrome (and other Google products') consent workflow was highlighted even further in the final ███████ documents—which Google had strenuously avoided producing in discovery. "Our research analysis and stakeholder interviews," the final white paper concluded, "have shown that Google's consent approach, enabling the broad collection and use of personal data, is a root cause for our systemic privacy challenges." 4-ER-626-27. It continued: "People often face significantly complex consents when they are creating a Google Account. Or trying to accomplish a particular task, and don't have the time or capacity to absorb all the details, let alone understand the precise impact their choices might have on the particular services they use." *Id.* As a result, the company's "approach to consent has become out-of-step with user expectations and regulations [by] mak[ing] it difficult for people to understand how we use their data in all circumstances." *Id.* These damning conclusions were drawn from dozens of interviews with Google stakeholders, including engineers and high-ranking executives, which revealed numerous related concerns, including the following:

- "We have gaps in how our system works and what we promise to people."

- "At Google, we still seem to believe in that fantasy that users agreed to this."

- "They don't make sense because of the naming and there are hidden functions that people don't know. Like Chrome sync and others that I don't even understand and can't describe."

- "I don't like the idea of Google having data about users that they can't say no to."

- "There are core stakeholders at the company who think that privacy is impossible or too hard to do and therefore not worth it."

- "Users don't know what is happening under the hood."

- "Won't it creep people out to know how much we are paying attention?"

- "Signup flows are not a good moment to explain or present these kinds of things to users."

- "Do you think it is possible for users to reckon with and make a choice about data collection for the aggregate? No, because we don't frame consent this way."

- "We don't understand our users. Every time we run these studies, we learn that users don't get us and we don't know what to do."

- "They (users) don't understand what is going on, and nobody is talking to them about it. They are being talked at."

- "We are not taking our responsibility as a steward of user data seriously."

- "There is no coherent and simple access to privacy controls across all apps, in Chrome and Android."

4-ER-627-30 (detailing other concerns about consent).[10]

---

[10] As noted in the statement above, the district court refused to consider these final ███████ documents, even though the magistrate judge had ruled that, as a result of Google's discovery misconduct, the documents were admissible for all purposes in "any further proceeding in this case." 4-ER-638.

Finally, the plaintiffs' experts—two leading scholars on privacy and privacy decision-making—reached the exact same conclusion as Google's internal analyses: The company's terms and privacy-related disclosures failed to clearly communicate that Chrome users' personal information would be sent to Google in the absence of syncing. As the experts opined, "there are several express statements in the Chrome Privacy Notice that, assuming that the user reads it, could lead reasonable consumers to believe that Google does *not* collect their personal information if they are not synced." 5-ER-705-06 (emphasis added). Google's belief that Chrome users would ignore these "relatively straight-forward statements about sync and Chrome browsing history" in favor of generalized statements in the company's broader Privacy Policy, the experts further testified, "is contrary to how normal people consider relationships with the services they use." *Id.* The experts thus concluded that "the Chrome user interface does not explicitly explain that Chrome routinely sends their personal information to Google," nor does it "explain, in a way that is readily comprehensible to consumers, what kind of data is collected and sent and how It is used." *Id.*; *see also* 7-ER-1306-14.

\* \* \* \* \*

In sum, the question before this Court is straightforward: Could a reasonable user expect that Google meant what it said when it promised Chrome users that their personal information "won't be sent to Google unless [they] choose to store that data

in [their] Google Account by turning on sync"? 3-ER-358. All of the record evidence—the company's actual disclosures, Google's internal analyses and conclusions, the company executives' and engineers' own understanding, and the plaintiffs' expert testimony—indicates that the answer is yes. At the very least, this evidence raises genuine disputes of material fact about what exactly a reasonable user would believe. *See infra* Section II.

But, despite this evidence, the district court concluded that *no* reasonable jury could find that *any* reasonable user would take Google at its word—and, as a result, that every reasonable Chrome user expressly consented to having highly sensitive personal information sent to Google on a continuous basis. That conclusion, as we explain below, was fundamentally flawed.

### C. The district court's contrary conclusion failed to properly consider how a reasonable Chrome user would have understood Google's disclosures.

Although the district court recited the correct background principles, its analysis of the plaintiffs' consent here diverged from those principles at the starting gate. Instead of evaluating how a reasonable Chrome user would understand Google's disclosures when taken as a whole, the court balkanized the various disclosures based on its own idiosyncratic understanding of the technical details of how users' personal information was sent to Google. Based solely on the erroneous premise that the data transmissions here were "browser-agnostic," the district court effectively ignored

41

Google's Chrome-specific promises in favor of the company's broad statements about how it generally collected data. The district court's approach cannot be reconciled with the governing reasonable-user standard. It therefore must be reversed.

1. As discussed above, to determine whether a defendant obtained consent for a particular activity based on its disclosures, the defendant must show that a reader would understand from those disclosures that the company engaged in that activity. So the relevant question here is whether Google's disclosures "explicitly notify" users that Chrome sends their personal information to Google regardless of whether sync is turned on. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022). And that question is assessed from the perspective of an ordinary, reasonable Chrome user.

The district court flipped these principles on their head. Instead of trying to determine how a reasonable user would understand Google's various terms and privacy policies, the district court sought to determine—in the abstract—"which agreement controls the at-issue data collection." 1-ER-16 (identifying this as one of the "core issues" for consent). In other words, the district court made the technical details of Google's data collection the primary lens through which to view the disclosures. If "the data collection at-issue [wa]s specific to Chrome," the court believed, then the Chrome-specific promises in the Chrome Privacy Notice applied. 1-ER-16-20. But if it was "browser-agnostic"—if Google collected the same data from non-Chrome

browsers—then all that mattered were the company's generalized statements in the terms of service and Privacy Policy. *See id.*

None of this can be squared with the controlling consent inquiry that the court should have undertaken. Nothing about consent depends on whether the data transmissions were in fact "browser agnostic"—or any other technical details. Nor did the district court identify any authority requiring such a convoluted analysis. That's because there is none. All the court was supposed to do at the summary-judgment stage was evaluate whether, from the perspective of a reasonable user, Google unambiguously disclosed that Chrome would *send* users' personal information to Google regardless of sync status. If not—if there were even one other plausible interpretation of the disclosures as a whole—then Google failed to meet its burden to demonstrate that it unambiguously obtained the plaintiffs' consent. *See supra* Section I.A.

Judge Koh's order on the motion to dismiss got this right. "[N]either Google's Privacy Policy nor any other disclosure to which Google points," she observed, "states that Google engages in the alleged data collection while users are using Chrome without sync." 3-ER-413. "To the contrary, Google's disclosures state that the data will not be sent to Google when users use Chrome without sync." *Id.* And because "Google's representations might have led a reasonable user to believe that Google did not collect his or her personal information when the user was not synced," she

concluded, "Google cannot show that Plaintiffs expressly consented to Google's collection of data." 3-ER-412.

That same chain of analysis was equally applicable at summary judgment. Indeed, the district court properly applied the governing consent principles in *Brown*, the related case challenging Google's collection of Chrome users' data while they browsed in "incognito" mode. There, as here, Google "argue[d] summary judgment [wa]s appropriate because it disclosed"—in the very Privacy Policy on which it relies here—"that it collects users' data in general, even if it did not disclose that it collects users' private browsing data in particular." *Brown*, 2023 WL 5029899, at *7. The *Brown* plaintiffs, by contrast, pointed to Google's various representations about incognito mode "affording more privacy than regular browsing mode," which they argued would affect how a reasonable user would understand Google's privacy practices. *See id.* at *7-*8. The district court "reject[ed] Google's argument that the Privacy Policy unambiguously discloses the at-issue data collection," finding that—based on Google's other representations and omissions, as well as Google's internal analysis of its consent flow—"a material dispute of fact remain[ed] regarding the scope of users' consent." *Id.* at *8.

That is precisely what the district court should have done here. Indeed, Google's representations to Chrome users here are *more* directly in conflict with its generalized disclosures about data collection than in *Brown*. The *Brown* court found

44

that Google's statements about "what it means to browse privately" (at best, implicit privacy promises) "could be read to contradict [Google's] suggested interpretation of the Privacy Policy." *Id.* But here, Google *explicitly* promised Chrome users that their information "won't be sent to Google unless" they turned on sync. It is eminently reasonable for a user to believe that Google simply meant what it said—at the very least, it should have created a material dispute of fact.[11]

**2.** But, instead of doing what it did in *Brown,* the district court here adopted a novel approach to consent that effectively removed the reasonable user from the inquiry altogether. As noted above, the district court believed that ascertaining the relevant disclosures for obtaining consent turned *completely* on "whether the data collection at-issue is specific to Chrome or browser-agnostic." 1-ER-16-17. As a result, the "browser agnostic" question—which played a minor role in the parties' summary-judgment briefing and was entirely absent from Judge Koh's motion-to-dismiss order—became the primary determinant of consent for the district court. After conducting a lengthy evidentiary hearing on solely this question, the district court found that "the undisputed evidence shows that the at-issue collection is browser-agnostic, with the exception of the X-client-data header." 1-ER-19. And

---

[11] *Brown* tersely distinguished this case on its facts. *See* 2023 WL 5039899 at *9 (stating that this case "did not involve Incognito mode," and its "reasoning therefore does not extend here").

because, in the court's view, the "at-issue data collected is not specific to Chrome but browser agnostic," the court determined that Google's general policies applied—essentially to the exclusion of the Chrome Privacy Notice. *Id.*; *see also* 1-ER-28 (explaining that the Chrome Privacy Notice's promises did not "negate[]" consent because "the at-issue data is not specific to Chrome").[12]

But, as already explained, this analysis had nothing to do with the actual question before the court: "Would a reasonable user who viewed [Google's] disclosures have understood that" Chrome was sending their personal information to Google "such that the user's acquiescence demonstrates that she consented to or authorized the collection?" *See Perkins*, 53 F. Supp. 3d at 1212; *see also, e.g.*, *Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 794.

To justify its departure from the settled framework for evaluating consent, the district court held that its analysis was required by this Court's unpublished decision in *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018). *See* 1-ER-24-25. It was mistaken.

---

[12] The court conceded that the X-client-data header "[wa]s specific to Chrome, and accordingly, the Chrome Privacy Notice governs the collection of that piece of data." 1-ER-20. But it (erroneously) concluded that the Chrome Privacy Notice adequately disclosed the use of the X-client-data header. *See* 1-ER-23 (suggesting that users could find this information by going to the "Identifiers in Chrome" section in the notice, scrolling through the subsection on "Field Trials," and clicking a link to "Learn More," where they could read Google's technical "Chrome Privacy White Paper" mentioning the X-client-data header).

In *Smith*, this Court affirmed the district court's finding that the plaintiffs "consented to Facebook's data tracking and collection practices" based on "numerous disclosures related to information collection on third-party websites." 745 F. App'x at 8-9. As here, those disclosures included the company's general terms of service and general privacy policy. *See id.* But unlike in this case, Facebook made no express or direct promise in service-specific terms that contradicted the company's general disclosures. *See Smith*, 262 F. Supp. 3d at 953-54. By contrast, here, Google *expressly* promised Chrome users that they "don't need to provide any personal information to use Chrome," and that this information "won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." 3-ER-357-58. So, aside from being non-precedential, *Smith* simply doesn't address a situation like this one, in which the company's generalized statements about data collection conflict with its more specific privacy-related representations.

Indeed, to the extent it is relevant, *Smith* actually *supports* the plaintiffs on consent. There, this Court squarely held that, "[i]n determining consent, courts consider whether the circumstances, *considered as a whole*, demonstrate that a *reasonable person* understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Smith*, 745 F. App'x at 8 (emphasis added). This kind of holistic analysis necessarily requires consideration of Google's promises in the Chrome Privacy Notice, which Google itself said governs in

47

the event of a conflict. Yet the district court did exactly the opposite: It held that the Chrome Privacy Notice's promises to Chrome users were entirely irrelevant to establishing consent because the challenged data transmissions were not "specific to Chrome." *See* 1-ER-27-28. That blindered technical approach to Google's disclosures cannot be squared with *Smith*, which expressly applied the reasonable-user consent framework. This legal error, standing alone, requires reversal.

## II. At a minimum, disputed issues of fact precluded the district court from resolving the issue of consent at summary judgment.

In deciding the consent question at the summary-judgment stage, the district court here usurped the jury's role in two distinct and critical respects—both of which independently warrant reversal. *First*, the district court effectively ignored the evidence discussed above favoring the plaintiffs' understanding of Google's disclosures, and it refused to draw inferences in favor of the plaintiffs when it came to Google's own internal statements regarding the effects of these disclosures. *Second*, the district court's assumption that Google's data collection was "browser agnostic"—which, as explained below, was both wrong and irrelevant—ignored that this, too, was an intensely disputed factual issue. So, like the primary issue concerning reasonable user's expectations, it should have been left for the jury to decide.

**A.** This Court has been clear: Consent is a question that is "normally for the trier of fact to determine." *Tsao*, 698 F.3d at 1149 (quoting Restatement § 892A(2) cmt. d); *see also, e.g., Davis v. Bud & Papa, Inc.*, 885 F. Supp. 2d 85, 91 (D.D.C.

2012) (noting that "the presence and scope of consent is a fact-sensitive matter"). That is also true in cases where companies argue that internet users consented to the collection, transmission, or other manipulation of their personal information. In this context too, under both federal and California law, the question whether a company's "disclosures obtained effective consent" is typically "an issue for the jury." *See Opperman*, 205 F. Supp. 3d at 1073; *Location Hist. Litig.*, 428 F. Supp. 3d at 192; *cf. Quintanilla*, 133 Cal. App. 4th at 115 (observing that "[t]he law is clear in California that the existence of informed consent is an issue of fact for the jury," because it is "a peculiarly fact-bound assessment which juries are especially well-suited to make") (citing *Arato v. Avedon*, 5 Cal. 4th 1172, 1186 (1993)).

The district court's summary-judgment ruling showed no fidelity to these principles. Time and again, the court improperly refused to credit the plaintiffs' evidence—and even worse, it drew factual inferences in *Google*'s favor. This was true at the broadest level: The court concluded, just based on its own reading of the disclosures and evidence, that a reasonable user would understand that Google "collect[s] its users' data when users use Google services or third party sites that use Google's services," "uses the data for advertising purposes," and "combines and links this information across sites and services for targeted advertising purposes." 1-ER-25. And it simply disagreed—again, based only on its independent reading—with the plaintiffs' evidence showing that an ordinary Chrome user reading the Chrome Privacy

Notice's express promises could believe that their information would not be sent to Google while using the browser without sync turned on. 1-ER-27-28. The court, in other words, arrogated to itself the central factual question of how a reasonable user would understand Google's promises in the context of this complicated set of interlocking and overlapping documents—a question that is far more appropriate for the jury to answer.

But the district court's more granular analysis of the evidence also suffered from these (and other) fundamental errors. To take just one example, the district court critiqued the plaintiffs for relying on Google's promise that "the personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync." 1-ER-28. According to the court, that promise was irrelevant because the "at-issue data collection" was not "information that Chrome stores" but "data that Google receives when users visit websites . . . while using Chrome." *Id.* But whether or not Chrome stored the information that was sent to Google was itself a disputed factual issue. *See* 8-ER-1394 (noting that "[a] Chrome browser can hold cookies for many different Web sites"); 3-ER-392 (Google's expert admitting that Chrome stored browsing history for 90 days and cookies "usually for an indefinite amount of time").

More critically, the question at the heart of this case is what a *reasonable user* would expect when reading that promise—not what a federal judge understands about

it after discovery is complete and an hours-long evidentiary hearing on the underlying technical details. The district court did not even try to explain how an ordinary user would have any idea about how their personal information was actually communicated to Google—*i.e.*, whether it was "stored" or "received." Nor did it try to square its assertion about reasonable users' expectations with the plaintiffs' *evidence*, which overwhelmingly showed that a reasonable user would *not* understand Google's promise as the district court did. *See supra* pp. 14-16.

The district court also inexplicably refused to consider the plaintiffs' evidence showing "the extent and scope" of Google's data collection and transmissions altogether. 1-ER-26. In the court's view, none of this evidence was relevant because it "[wa]s not alleged in, nor forms the basis of, plaintiffs' operative complaint." 1-ER-26-27. This was incorrect on multiple levels. To start, the complaint did allege details about the extent and scope of Google's privacy invasions. *See, e.g.*, 8-ER-1534, 1556. More importantly, however, there was no need for the plaintiffs to do so. That's because consent is an affirmative defense, meaning it was *Google's* burden to prove. And, as explained, to establish its consent defense, Google must demonstrate that the plaintiffs consented "to the particular conduct," which "[v]ery often . . . becomes a question of degree." Restatement § 892A(2)(b) & cmt. c. So the evidence concerning the "extent and scope" of Google's surveillance was highly relevant—indeed critical— to the consent question. The district court erred in concluding otherwise.

Finally (and perhaps most egregiously), the district court dismissed out of hand *all* of the evidence showing that Google's own executives and engineers concluded that the company's consent process was broken. It did so largely based on its view that this evidence wasn't credible or persuasive enough—that they were "general in nature and d[id] not address the specific disclosures and/or at-issue data," or that they were "cherry-picked." 1-ER-28-29. That was wrong as a factual matter; as explained above, the ████████ and other internal analyses expressly evaluated the Chrome consent process and sync. *See supra* pp. 18-20.[13]

But, more importantly, the district court misapprehended its role at the summary-judgment stage. "[I]t is for the trier-of-fact, not the court deciding whether to grant summary judgment, to determine issues of credibility." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1149 (9th Cir. 2002); *see, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). The jury, of course, is entitled to conclude that the internal evidence is too general or vague to bear on its finding of consent. But the district court

---

[13] As explained above, the district court's critique of the plaintiffs' submission of "draft" documents, 1-ER-29 n.13, was particularly bizarre given that it improperly refused the plaintiffs' motion to supplement the record with the *final* ████████ documents. *See supra* pp. 24-25.

52

cannot—especially when, at the same time, it decides to *credit* Google's assertions that generalized disclosures about data-collection in its Privacy Policy somehow trump specific promises that the company made to users in the Chrome Privacy Notice.

Bottom line: "[W]here the district court has made a factual determination, summary judgment cannot be appropriate." *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 990 (9th Cir. 2016) (en banc). Yet that is exactly what the district court did here. It parsed the contract documents based on its own view of what a reasonable user would do, refused to draw factual inferences in favor of the plaintiffs, and erroneously disregarded whole categories of evidence. Its summary-judgment order therefore should be reversed.

**B.** The district court also erred in applying Rule 56's basic standards to the narrower question of whether the data transmissions to Google at issue here were "browser agnostic." As explained above, this question was irrelevant to establishing consent here, because that should have turned on a reasonable user's understanding of the various privacy disclosures. But even on its own terms, the district court's "browser-agnostic" finding impermissibly took this question of fact—which was intensively disputed—away from the jury. That error warrants reversal as well.

According to the district court, it was "undisputed" that the data transmissions at issue here were "browser-agnostic"—that is, they occur whether the user is using Chrome or another browser. 1-ER-17-19. This conclusion rested on the district court's

53

assertion that the plaintiff's expert, Dr. Zubair Shafiq, "d[id] not dispute that the at-issue data is collected irrespective of the browser used." 1-ER-18.

That assertion simply cannot be reconciled with the actual record. To the contrary, Dr. Shafiq's unrefuted testimony was that the information Chrome sends to Google is significantly different from the information sent by other browsers. *See generally* 7-ER-1262-70 (detailing the ways in which Chrome's personal-information transmission practices differ from other browsers); *see also* 7-ER-1189 (noting that "Chrome is the only browser where 'sync' does not control the data flow to the browser manufacturer"). For example, he testified that IP addresses from other browsers, like Safari, will be "masked" (or hidden). 4-ER-479. But Chrome does not mask this information when sending it to Google. *See id.* Similarly, he testified that the user-agent information sent to Google "would be less precise in non-Chrome browsers" as compared to Chrome. *Id.* And when asked if "there [is] a difference between the URL that Chrome sends and that Safari sends," he testified that there was: Unlike Chrome, Safari and Firefox "do[] not send full URLs." 4-ER-487. The differences between the browsers' treatment of cookies is even more striking. Although Chrome routinely sends Google third-party tracking cookies, Google "agree[d] [that] third-party cookies are not ordinarily, in default, sent by some of the other browsers." 4-ER-485. And everyone agrees that no browser other than Chrome sends the highly intrusive X-client-header identifier to Google. 1-ER-17 n.4.

That's not all: Google's own corporate witness admitted that "every major browser handles cookies differently" and that "no two browsers have the same behavior," 2-ER-242, while its own experts conceded that other browsers transmitted far less first-party cookie information than Chrome did, 2-ER-266 (noting that Safari "sometimes caps first-party cookie lifetimes at 24 hours and sometimes at seven days"). And Dr. Zervas's—Google's primary expert here—testimony elsewhere fully supports the plaintiffs' characterization of the data transmissions here as *not* browser-agnostic. As he explained, "[w]hile the core functionality of most modern browsers is the same, browsers may differ in their default settings." Declaration of Georgios Zervas at 85-86, *Doe v. Google* (N.D. Cal. Aug. 3, 2023) (No. 3:23-cv-02431-VC) (noting that "in default settings, Chrome allows all cookies in regular browsing mode . . . and only blocks third-party cookies in private browsing mode" whereas "Firefox and Safari both block third-party cookies by default"). Given this, he specifically recognized that "the user's choice of browser will impact data transmissions to Google domains." *Id.* This conflicting testimony only reinforces that the district court should not have decided the highly factual "browser-agnostic" question as a matter of law.

As already explained, whether the data transmissions here were actually "browser agnostic" or not should not bear on the consent question here. But, even if it did, the factual disputes raised above should have been enough to preclude summary

judgment on that question. "[W]here evidence is genuinely disputed on a particular issue—such as *by conflicting testimony*—that issue is inappropriate for resolution on summary judgment." *See Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (emphasis added). By resolving the "browser agnostic" question (and many others) for itself, the district court improperly substituted its judgment for that of the jury.

## CONCLUSION

The district court's summary-judgment order should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

NEIL K. SAWHNEY
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336

LESLEY WEAVER
BLEICHMAR FONTI & AULD, LLP
1330 Broadway, Suite 630
Oakland, CA 94612
(415) 797-2617s

DAVID A. STRAITE
CORBAN S. RHODES

DICELLO LEVITT LLP
485 Lexington Avenue, 10th Floor
New York, NY 10017
(646) 933-1000

ADAM J. LEVITT
AMY E. KELLER
ADAM PROM
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900

JASON O. BARNES
THIEN AN VINH TRUONG
SIMMONS HANLY CONROY, LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6276

ERIC S. JOHNSON
JENNIFER M. PAULSON
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
(618) 259-6231

September 25, 2023                    *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,448 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this reply brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler