# No. 22-16993

PATRICK CALHOUN, ET AL.,

*Plaintiffs-Appellants,*

v.

GOOGLE, LLC,

*Defendant-Appellee.*

On Appeal From The United States District Court
for The Northern District of California
No. 4:20-cv-05146-YGR (Hon. Yvonne Gonzalez Rogers)

## ANSWERING BRIEF OF DEFENDANT-APPELLEE GOOGLE, LLC

Stephen A. Broome
Viola Trebicka
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-30003
stephenbroome@quinnemanuel.com
violatrebicka@quinnemanuel.com

Christopher G. Michel
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000

Andrew H. Schapiro
Joseph H. Margolies
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com
josephmargolies@quinnemanuel.com

*Attorneys for Defendant-Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Google LLC, by its undersigned counsel, states as follows:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded Company holds more than 10% of Alphabet Inc.'s stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ...............................................................4

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW..............................4

STATEMENT OF THE CASE ........................................................................4

    A.    Background...........................................................................4

        1.    The Standardized Data Transmissions At Issue Are The Backbone Of Internet Communications ....................4

            i.    HTTP And Web Communications ....................4

            ii.    Google's Web Services.....................................7

        2.    Google's Chrome Browser Offers A "Sync" Feature Unrelated To The Data Transmissions At Issue .......................9

        3.    Google's Disclosures Clearly Explain Its Data Collection Practices.......................................................11

            i.    Google's Privacy Policy.................................11

            ii.    "Consent Bump" Agreement..........................15

            iii.    New Account Creation Agreement ................17

            iv.    Plaintiffs Could View the At-Issue Data In Their MyActivity Pages And Chrome Tools ..........................18

            v.    Chrome Privacy Notice..................................19

    B.    Procedural History .........................................................21

        1.    The District Court Denies In Part Google's Motion To Dismiss ...............................................................21

        2.    Google Moves For Summary Judgment After Discovery Confirms Plaintiffs Consented To Google's Privacy Policy And Account Holder Agreements, And Never Read the Chrome Privacy Notice ...................................22

        3.    The Magistrate Judge Admonishes Plaintiffs For Mischaracterizing Evidence In Discovery Disputes. ...............23

4. The District Court Conducts A Full-Day Evidentiary Hearing After Plaintiffs Belatedly Argue The At-Issue Data Collection Is Not Browser-Agnostic ................................ 24

5. The District Court Grants Google's Motion For Summary Judgment ............................................................................. 26

SUMMARY OF ARGUMENT .......................................................................... 29

ARGUMENT ..................................................................................................... 30

I. PLAINTIFFS CONSENTED TO THE AT-ISSUE DATA COLLECTION ............................................................................... 30

A. Plaintiffs Agreed To Clear Disclosures Explaining Google Receives The At-Issue Data When Users Interact With Its Web Services .............................................................. 31

B. The Chrome Privacy Notice Does Not Negate Plaintiffs' Consent ................................................................................... 37

1. Plaintiffs Did Not Read The Chrome Privacy Notice .............. 38

2. The Chrome Privacy Notice Does Not Promise Google Will Not Receive The Data At Issue ...................... 39

C. The Judgment Does Not Turn On Technical Knowledge ................. 43

II. THE MATERIAL FACTS ARE NOT IN DISPUTE ............................. 45

A. Plaintiffs' Evidence Fails To Raise A Material Question Of Fact ...................................................................................... 46

1. Plaintiffs' Experts Offer No Evidence To Support Their Interpretation Of Google's Disclosures .................... 47

2. Google Employees' Statements And Internal Discussions Are Not Material To Plaintiffs' Consent ................................. 50

B. The Challenged Data Collection Practices Are Browser-Agnostic ................................................................................... 56

III. PLAINTIFFS' FRAMEWORK WOULD FRUSTRATE EFFORTS TO CRAFT USEFUL DISCLOSURES ....................................... 59

CONCLUSION ................................................................................................. 60

CERTIFICATE OF COMPLIANCE ................................................................ 62

CERTIFICATE OF SERVICE ......................................................................... 63

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................54

*In re Apple Computer Securities Litig.*,
    886 F.2d 1109 (9th Cir. 1989)................................................54

*Brown v. Google*,
    2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) ..........................36, 37

*Cabrera v. Cordis Corp.*,
    134 F.3d 1418 (9th Cir. 1998)................................................49

*Claar v. Burlington N. R. Co.*,
    29 F.3d 499 (9th Cir. 1994)....................................................49

*Evangelista v. Inlandboatmen's Union of Pac.*,
    777 F.2d 1390 (9th Cir. 1985)................................................50

*F.B.T. Prods., LLC v. Aftermath Records*,
    621 F.3d 958 (9th Cir. 2010)..................................................34

*Garcia v. Enter. Holdings, Inc.*,
    78 F. Supp. 3d 1125 (N.D. Cal. 2015)....................................35

*Javier v. Assurance IQ, LLC*,
    2021 WL 940319 (N.D. Cal. Mar. 9, 2021)............................35

*Jones v. Slade*,
    23 F.4th 1124 (9th Cir. 2022)................................................45

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009)................................................54

*MLB Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..................................................49

*Nieves Martinez v. United States*,
    997 F.3d 867 (9th Cir. 2021)............................................................49

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1190 (N.D. Cal. 2014)............................................35

*Silver v. Stripe*,
    2021 WL 3191752 (N.D. Cal. Jul. 28, 2021)...........................34, 35

*Smith v. Facebook, Inc.*,
    262 F. Supp. 3d 943 (N.D. Cal. 2017)......................................32, 33

*Smith v. Facebook, Inc.*,
    745 F. App'x 8 (9th Cir. 2018)....................... 27, 30, 31, 33, 38, 39

*Thompson v. Paul*,
    547 F.3d 1055 (9th Cir. 2008).........................................................45

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012).........................................................36

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011).........................................................50

## Statutes

Cal. Civ. Code § 1644..........................................................................40

Cal. Civ. Code § 3515..........................................................................30

California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*.......21, 22, 40

## Other Authorities

Federal Rule of Civil Procedure 56(e)..................................................25

Restatement (Second) of Torts § 892A(2)(b) ................................26, 36

Restatement (Second) of Torts § 892A(2) cmt. c ................................36

# INTRODUCTION

Plaintiffs' appeal hinges on the mistaken premise that the decision below "adopted a novel consent framework that turned" on "the technical (and largely non-public) details of how Chrome transmitted" certain categories of data to Google. In fact, the district court applied the exact "consent framework" Plaintiffs urge on appeal, and rejected Plaintiffs' claims on grounds that were neither "novel" nor "technical": each Plaintiff undisputedly agreed to the Google Privacy Policy and other agreements that describe the precise data collection and use that Plaintiffs challenge. The order rejecting Plaintiffs' individual claims (and denying class certification) reflects a straightforward application of the consent principles this Court affirmed in the substantively identical case *Smith v. Facebook, Inc.*, and that district courts in this Circuit have consistently applied for a decade.

Plaintiffs' claims arise from Google's receipt of routine, industry-standard transmissions sent when users visit websites that use Google's advertising, analytics, and other web services (the "Web Services"). Two critical facts concerning Google's receipt of data from its Web Services are undisputed. ***First***, Google's Privacy Policy and user agreements disclose the at-issue data collection. ***Second***, Plaintiffs each viewed these disclosures and clicked "I AGREE" to their terms. But Plaintiffs argue, implausibly and contrary to overwhelming evidence, that they believed Chrome—Google's browser—would categorically block the expressly disclosed transmissions

to Google's Web Services *by default* unless users enabled Chrome Sync, a browser personalization feature totally unrelated to the Web Services.

Plaintiffs' claims make no sense, and the district court was right to reject them. Google informed Plaintiffs it collected the at-issue data in several plain-language disclosures they saw and agreed to. And it routinely reminded them to access "MyActivity" pages in their Google Accounts, where Google displayed the websites Plaintiffs had visited from which Google received the at-issue data. Chrome Sync, by contrast, is consistently described not as a privacy control, but as a browser personalization feature that allows Chrome users to access the same browser settings, bookmarks, login information, and Chrome browsing history on all their Synced devices.

Plaintiffs root their claims in the Chrome Privacy Notice, a disclosure they admit they never read, that describes features "specific to Chrome." They argue that the Chrome Privacy Notice's (accurate) statement that "the personal information that Chrome stores" is not sent to Google's servers when the Sync feature is turned off constitutes "assurances that *no data* would be sent to Google unless synced." As the district court correctly determined, their illogical argument "completely ignore[s] critical text and read[s] others out of context," and cannot stand up to the undisputed facts. Simply put, the "personal information" referenced in Plaintiffs' preferred passages of the Chrome Privacy Notice is *not* the at-issue data described in

2

Plaintiffs' complaint, and the Chrome Privacy Notice says nothing about whether Google's Web Services will receive the separate data at issue. Google's receipt of that data is governed by (and disclosed in) the browser-agnostic agreements Plaintiffs accepted.

Plaintiffs' mischaracterizations pervade their appeal, but began in the district court. Indeed, both the district judge and magistrate judge independently admonished Plaintiffs for their "tendency to misstate or exaggerate the record," "repeatedly mischaracteriz[ing] the record," "misquot[ing] and cherry-pick[ing]" documents and disclosures, and "mischaracteriz[ing] key deposition testimony." Plaintiffs double down on that strategy now, taking the further step of misrepresenting the well reasoned decision dismissing their claims.

Plaintiffs also contend that the district court improperly resolved disputes of material fact, but they are mistaken. As the district court recognized, the parties and their experts agreed on the facts that mattered. To the extent Plaintiffs and their experts urged a different legal conclusion, they had no factual basis for doing so. Separately, Plaintiffs attempt to portray certain internal Google documents as inconsistent with the judgment, but those documents do not address any issues material to this dispute. Plaintiffs and their *amici* likewise resort to slinging mud at Google for a wide variety of grievances with no relation to this case. Whatever else

can be said of that approach, it underscores the weakness of Plaintiffs' legal position. The district court's decision should be affirmed.

## JURISDICTIONAL STATEMENT

Google agrees with Plaintiffs' Jurisdictional Statement.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the district court correctly determined that Plaintiffs' admitted consent to Google's Privacy Policy and Account Holder Agreements—which indisputably disclose the challenged data collection—defeats their claims.

## STATEMENT OF THE CASE

### A.    Background

#### 1.    The Standardized Data Transmissions At Issue Are The Backbone Of Internet Communications

##### i.    HTTP And Web Communications

The data at issue is the daily stock-in-trade of all internet browsing. Users access websites through software applications called browsers, which display web pages based on communications with servers that host those pages' content and functionality. All of these internet-connected devices communicate using a standardized set of rules known as the "Hypertext Transfer Protocol"—or "HTTP"—which provides a universal method for requesting and receiving information over the internet. 2-ER-76, 119–20.

When a user visits a website, their browser sends an HTTP transmission called a "GET request" to the server that hosts the site. 2-ER-77. As its name suggests, a GET request asks the server to send the browser whatever information is necessary to render the webpage. *Id.* Users can also ask the server to accept information from the user's device (*e.g.*, when filling out online forms) using a similar HTTP communication called a "POST request." *Id.* By convention, GET and POST requests each include a standard set of information—carried in data fields called "headers"—that facilitate the server's response. *Id.*; *see also* 2-ER-179 ("When we talk about … what's in the head of an HTTP request, this is standard information that's included on every HTTP request regardless of which browser you're talking about."). These HTTP headers tell the server, for example, what page the user is requesting (so the server knows what to send back) and where the user is located on the network (so the server knows where to send it). Based on the information it receives through GET requests, the server responds with code the browser interprets to display the page.

Websites appear on a browser as a unified image, but most actually consist of multiple independent components from various sources, including resources that third parties (like Google and many others) host on their own servers. 2-ER-79. For example, a news website might host the text of an article on the publisher's servers, and partner with a third-party advertising service that hosts ads on its own servers.

2-ER-81. Or an e-commerce site may host images of its wares, and partner with a payment processing service that separately hosts infrastructure for payment functions. 2-ER-79. Website publishers include such third-party resources on their sites by embedding code from the service provider (often called a "script" or "tag") directly within their site's code. 2-ER-80. When a user visits that site, their browser (*e.g.* Google Chrome, Microsoft Edge, or Apple Safari), reads the code and retrieves the site's content from each server on which its components are hosted. If the website incorporates a third-party service, that service's "tag" instructs the browser to retrieve the relevant resources from the third party's servers using a GET request. This routine exchange forms the backbone of the Internet, and occurs on hundreds of millions of websites across the world every day.

All of the at-issue data—except the X-Client-Data header described below—is standard HTTP-header information that users, web publishers, and third-party web services use to carry out these basic functions of requesting, sending, and receiving web content. *See* 2-ER-177. Specifically:

- **IP Addresses** are sequences of numbers used to indicate a device's location on a network, allowing other devices (including servers that host website content) to communicate with it. 2-ER-75, 210.

- **User-Agent** is a standard HTTP header that indicates the type of device and browsing software sending the resource request, allowing the server to return content compatible with that device (*e.g.*, the mobile version of a website if the user is accessing the site from a smartphone). 2-ER-77, 91, 210–11.

- **Referer Headers** are standard HTTP headers that include the web address (or "URL") of the page that referred the browser to the requested server (*e.g.*, where third-party resources will be used). The referer header allows a third-party server to determine what content to send back. 2-ER-90, 177, 210, 305.

- **Cookies** are text files, transmitted in standard HTTP headers, that recall small pieces of information across different visits to the same website, such as the contents of an online "shopping cart" or whether a user is logged in. 2-ER-84–85.

- **X-Client-Data Header** is a specialized header that indicates what trial features are active on a Chrome user's browser, which allows Google to test those features. 2-ER-218; 3-ER-362. Unlike the other at-issue data, the X-Client-Data header is unique to Chrome and therefore described in Google's Chrome-specific privacy notice. *See infra* Statement of the Case ("SOC") A.3.v.

### ii. Google's Web Services

Google receives the at-issue data not because it operates Chrome, but because it offers website publishers a variety of popular Web Services—such as Google Maps, Google Ads, and Google Analytics. Rather than incurring the time and cost necessary to develop and maintain certain features for themselves, publishers may choose to incorporate Google's ready-made software resources. For example, the restaurant review and reservation service Yelp uses Google Maps to display nearby restaurants to its users. 2-ER-110. News organizations like the New York Times and CNN use Google's advertising services to earn revenue when users view articles on their websites. 2-ER-174. And many businesses—large and small—use Google's

analytics service to understand how users interact with their websites. 2-ER-193, 202.

As described above, when a publisher chooses to implement a Google Web Service on its website, it incorporates a tag for that service into the site's code. When a user visits that page, the tag instructs the user's browser to request the relevant resource from Google's servers to form part of the website or provide additional functionality intended by the publisher. 2-ER-175–76. Like any other HTTP request, those resource requests may include the at-issue data to enable the use of Google's services.

Google's Web Services are designed to request and receive the same standard data categories from all website visitors, regardless of the user's device or browser. 2-ER-178, 195–96, 199. That makes sense: website publishers want their sites to display and function similarly for all users. Otherwise, visitors might experience the same website differently in different browsers, and publishers might receive a confusing and inconsistent picture of how users interact with their sites. *See* 2-ER-195.

Though Google's services are designed to operate the same way regardless of browser, the specific data Google actually receives from a given resource request may still vary depending on users' individual browser settings. For example, some browsers' default settings currently block or limit the transmission of third-party

cookies, 2-ER-181, modify the device's IP address before transmitting it, 4-ER-474, or transmit a shorter version of the URL of the page the user is visiting, 4-ER-487. These default settings vary across browsers, and change constantly. *See* 2-ER-181–82, 206; 4-ER-475. Moreover, users can always deviate from their browser's default settings and make more or less information available. But because the at-issue data is part of the standard, uniform language of the internet, all browsers can and do send each category of at-issue data to the websites users visit and the third-party services (including Google's) that are incorporated into those websites.

### 2. Google's Chrome Browser Offers A "Sync" Feature Unrelated To The Data Transmissions At Issue

Google Chrome is a browser available at no cost for all major desktop and mobile operating systems. Like all browsers, Chrome allows users to navigate the internet using the standard HTTP transmissions described above. In its default mode, Chrome stores certain categories of useful information locally on the user's device. These include saved bookmarks; "autofill" information like usernames, passwords, contact, and payment information (to automatically populate online forms); and Chrome browsing history (a list of all webpages the user has viewed using Chrome in the last 90 days). 7-ER-1352 ¶¶7–8.

Additionally, Chrome offers a personalization feature called Sync that allows users to store some or all of the foregoing categories of information in their Google Accounts so they can have the same personalized browsing experience when they

use Chrome on other synced devices. 7-ER-1350–52; 1-SER-254–59. For example, a user who chooses to Sync autofill information can automatically populate online forms in Chrome on their mobile device with information they saved while using Chrome on their desktop computer. When Sync is not enabled, Chrome saves the information only locally on the user's device: it is neither sent to their Google Account nor available on other devices. *See* 2-ER-223; 7-ER-1353 ¶10.

Chrome Sync is unrelated to Google's browser-agnostic Web Services, and none of the categories available to Sync is the at-issue data in this case. Plaintiffs attempt to conflate the two sets of information by suggesting (at, *e.g.*, Pls. Br. 8, 21) that referer headers in HTTP transmissions to Google's Web Services are equivalent to a user's Chrome browsing history. They are not. Chrome browsing history is a complete list of all pages a Chrome user visited (only in Chrome) in the last 90 days, whether or not the pages incorporate Google Web Services. 7-ER-1353 ¶9. The at-issue data, by contrast, includes only URLs from websites that use Google Web Services, and is collected regardless of browser. 7-ER-1353 ¶10. The sets of data are different, among other reasons, because they serve completely different purposes. Synced data is designed to provide a consistent browser experience across devices. The HTTP data in resource requests is designed to ensure Google's servers can determine what content to return to users and where to send it. Plaintiffs do not (and

cannot) allege that Google receives a user's *Chrome browsing history* (*i.e.*, the data available to Sync) via the HTTP requests at issue.

### 3. Google's Disclosures Clearly Explain Its Data Collection Practices

Contrary to Plaintiffs' characterization (at Pls. Br. 7), there is nothing "secret" about Google's receipt or use of the at-issue data. Google's public disclosures clearly explain that Google receives that data when users visit websites incorporating Web Services and may use it for targeted advertising and other purposes. *See* 7-ER-1348–97. And throughout the putative class period, Google advised account holders to view and control the data Google receives.

### i. Google's Privacy Policy

Plaintiffs admit they agreed to Google's Privacy Policy. 7-ER-1368–69 ¶¶34–35; 8-ER-1559 & n.2; 1-SER-106–07. The Privacy Policy—which by its terms applies to all Google services including Web Services like ads and analytics—explains that Google collects the at-issue data when users visit websites that use Google Web Services. For example, the Privacy Policy in effect at the start of the putative class period begins with a bold heading titled "**Information we collect**" and discloses that:

> We collect information about the services that you use and how you use them, like when you watch a video on YouTube, visit a website that uses our advertising services, or view and interact with our ads and content.

7-ER-1379–80 ¶51. The same section provides a detailed, plain-language breakdown of the categories of data Google collects, which includes all of the data at issue:[1]

- **Device information**

  We collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

- **Log information**

  When you use our services or view content provided by Google, we automatically collect and store certain information in server logs. This includes … details of how you used our service, such as your search queries[;] … Internet protocol address[;] … device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL[;] [and] cookies that may uniquely identify your browser or your Google Account.

- **Cookies and similar technologies**

  We and our partners use various technologies to collect and store information when you visit a Google service, and this may include using cookies or similar technologies to identify your browser or device. We also use these technologies to collect and store information when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites. Our Google Analytics product helps businesses and site owners analyze the traffic to their websites and apps. When used in conjunction with our advertising

---

[1] The only at-issue data not described in the Privacy Policy is the X-Client-Data header because that header is unique to Chrome and therefore addressed separately in the Chrome Privacy Notice. *See infra* SOC A.3.v.

> services, such as those using the DoubleClick cookie, Google Analytics information is linked, by the Google Analytics customer or by Google, using Google technology, with information about visits to multiple sites.

7-ER-1380–81 ¶51. After explaining that Google receives the at-issue data when users interact with Google's Web Services, the Privacy Policy expressly identifies those services as a *separate* source of information from Chrome Sync:

> This activity might come from your use of Google products like Chrome Sync <u>**or**</u> from your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics). <u>**These products**</u> share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.

7-ER-1382 ¶54 (emphases added).

As Google updated its Privacy Policy throughout the proposed class period, it continued to make similarly detailed disclosures, and to clearly identify Chrome Sync data and activity on third-party sites using Google services as wholly separate sources of information.[2] *See* 1-ER-20 ("It is … undisputed that the material terms of the General Privacy Policy … were the same throughout the class period."). For

---

[2] A complete archive of Google's Privacy Policy is available at https://policies.google.com/privacy/archive, and is incorporated by reference in the record below. *See* 7-ER-1379 ¶50.

instance, the Privacy Policy in effect when Plaintiffs filed suit disclosed, under the

bold heading "**Information we collect as you use our services**," that:

> We collect information about the apps, browsers, and devices you use to access Google services…. The information we collect includes unique identifiers, browser type and setting, device type and settings, [and] operating system…. We also collect information about the interaction of your apps, browsers, and devices with our services, including IP address, crash reports, system activity, and the date, time, and referrer URL of your request.

7-ER-1383–84 ¶56 (emphases added). The same section listed the various ways

Google may receive data from users:

> We collect information about your activity in our services….The activity information we collect may include:
>
> - Terms you search for
> - Videos you watch
> - **Views and interactions with content and ads**
> - Voice and audio information when you use audio features
> - Purchase activity
> - People with whom you communicate or share content
> - **Activity on third-party sites and apps that use our services**
> - **Chrome browsing history you've synced with your Google Account**
>
> We use the information we collect to customize our services for you, including providing recommendations, personalized content, and customized search results…. Depending on your settings, we may also show you personalized ads based on your interests.

7-ER-1385 ¶56 (emphases added). "Views and interactions with content and ads,"

"Activity on third-party sites and apps that use [Google's] services," and "Chrome

browsing history you've synced with your Google Account," are each identified as

14

*separate sources* of information. Google's Privacy Policy thus makes clear that Google receives data when users interact with "third-party sites and apps that use [Google] services" or "view[] and interact with [Google] content and ads" regardless of whether they use Chrome or Sync their Chrome browsing history.

### ii.    "Consent Bump" Agreement

In June 2016, existing Google account holders—including Plaintiffs Crespo, Henry, Wilson, and Johnson—were shown a "Consent Bump" Agreement when they logged into their Google accounts. *See* 7-ER-1357; 3-SER-420.

Among other disclosures, the Consent Bump explained that:

When you use Google services like Search and YouTube, you generate data – things like what you've searched for and videos you've watched. You can find and control that data in My Account under the Web & App Activity Setting.

With this change, this setting may also include ***browsing data from Chrome*** <u>***and***</u> ***activity from sites and apps that partner with Google, including those that show ads from Google***.

7-ER-1356 ¶19 (emphasis added).

Like the Privacy Policy, the Consent Bump identified "browsing data from Chrome" (*i.e.*, the Chrome browsing history stored in a user's Google Account if the user enables Sync) and "activity from sites and apps that partner with Google" (*i.e.*, the at-issue data Google receives when users visit websites using Google Web Services) as *separate sources* from which Google may receive information. *Id.* And like the Privacy Policy, the Consent Bump also explained that data stored in users'

Google Accounts—from either source—would be used to personalize ads unless the user disabled that setting. *Id.*

The Consent Bump invited users to "change [these settings] any time in My Account," and included a "Learn More" link that provided a further explanation of the at-issue data transmissions:

> **What do we mean by "websites and apps that partner with Google"?**
>
> Many websites and apps use Google technologies to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like partners who use Google Analytics to improve the ads they show).
>
> As you use these sites, your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google….

7-ER-1361–64 ¶25.

Google Account holders were not required to agree to the Consent Bump. Contrary to Plaintiffs' assertion (at Pls. Br. 18) that the Consent Bump "provided no obvious option for users to 'cancel' or otherwise decline the new features," the agreement presented Account holders with choices, including to decline the changes. 7-ER-1360 ¶24. Plaintiffs Crespo, Henry, Wilson, and Johnson were each shown the Consent Bump Agreement, and selected "I AGREE." 7-ER-1364–66 ¶¶27–31 (citing 1-SER-260–271; 3-SER-452–604).

### iii. New Account Creation Agreement

Users who created new Google Accounts after June 2016—including Plaintiffs Calhoun, Kindler, Wilson, and Johnson—were shown a New Account Creation Agreement that required the user's affirmative consent to create a Google Account.[3] *See* 7-ER-1368; 3-SER-413–14.

The New Account Creation Agreement linked to the Privacy Policy and stated clearly that "[b]y choosing 'I agree' below you agree to Google's Terms of Service [and] Privacy Policy, which describes how we process your information, including these key points…." 7-ER-1368 ¶34.

The New Account Creation Agreement then summarized the "Data we process when you use Google," including the at-issue data:

> When you search for a restaurant on Google Maps or watch a video on You Tube, for example, we process information about that activity— ***including information like the video you watched, device IDs, IP address, cookie data, and location.***
>
> ***We also process the kinds of information described above when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player.***

7-ER-1368–69 ¶¶34, 36. It further explained that Google uses the data to, among other things, "[d]eliver personalized ads, both on Google services and on sites and apps that partner with Google…." *Id.* Plaintiffs Calhoun, Kindler, Wilson, and

---

[3] This brief refers to the Consent Bump and New Account Creation Agreement as the "Account Holder Agreements."

Johnson created new Google Accounts after June 2016, and selected "I AGREE" to the New Account Creation Agreement. 7-ER-1377–78 ¶¶45–49 (citing 1-SER-272–284; 3-SER-605–660).

### iv. Plaintiffs Could View the At-Issue Data In Their MyActivity Pages And Chrome Tools

Google actively encourages users to review the data it receives. All Google Account holders have a MyActivity page (formerly, "My Account"), on which they can view, among other things, a list of third-party websites from which Google received the at-issue data, and the specific Web Services installed on those sites.[4] 7-ER-1388–91 ¶¶65, 68. The Account Holder Agreements included links to MyActivity. *Id.* ¶63. So did the Privacy Policy, Chrome Privacy Notice, and multiple Google Help Center articles. *Id.* ¶64. And Google *routinely reminded* users—including all Plaintiffs—to review their MyActivity pages via direct email. *See* 4-SER-851–927 (examples of emails Google sent to Plaintiffs directing them to their MyActivity pages).

On average, approximately 170 million Google Account holders visit MyActivity every week. 7-ER-1391 ¶69. Plaintiff Johnson visited his MyActivity page during the proposed class period. 7-ER-1391 ¶71; 4-SER-802. His page (and

---

[4] Users can also modify how Google stores or uses this activity data (*e.g.*, by instructing Google not to track their web activity or use it to personalize ads), delete that data outright, or schedule it for automatic deletion after a set period of time. 7-ER-1388–91 ¶¶65, 68.

all Plaintiffs' pages) showed that Google received the at-issue data when Plaintiffs visited websites using Google's Web Services *regardless* of whether they had enabled Sync. 7-ER-1391 ¶70; 4-SER-661–799. To the extent the other Plaintiffs did not review their pages, that is only because they chose to ignore Google's repeated recommendations to do so.

Chrome also allows users to view *in real time* the Web Services receiving HTTP requests on every site they visit. As Plaintiffs' own expert acknowledged, "[t]he Chrome browser also includes [tools] for analyzing Web pages that are being displayed by a Chrome browser," including by making "the [at-issue] data flow … visible." 7-ER-1401–02. He further admitted these tools are "pretty easy to bring up" and "[y]ou don't need to interpret code. It will actually say, for example, Google Analytics." 2-ER-302–03.

### v. Chrome Privacy Notice

Each Plaintiff admitted that they neither reviewed the Chrome Privacy Notice nor relied upon it as a basis for their alleged expectation that using Chrome without Sync would prevent Google from receiving the disputed data.[5] Thus, the

---

[5] *See* 4-SER-805–07; 1-SER-69–72; 4-SER-827–29, 838–40; 1-SER-115, 118–19, 122–23, 130–131, 134–35, 138–39 (Kindler Tr.); 1-SER-157–58, 161 (Calhoun Tr.); 1-SER-182–84 (Crespo Tr.); 1-SER-205 (Henry Tr.); 1-SER-218–19 (Johnson Tr.); 1-SER-239, 244, 247, 250–51 (Wilson Tr.).

interpretation of the Chrome Privacy Notice Plaintiffs advance is not one they ever held themselves.

Discovery also illustrated why Plaintiffs' theory that the Chrome Privacy Notice governs the data collection at issue makes no sense. In contrast with the Privacy Policy and Account Holder Agreements, which disclose the routine data transmissions Google receives when users in any browser visit websites using Google services, the Chrome Privacy Notice expressly applies only to "features that are specific to Chrome." 3-ER-357. And it clearly states that "any personal information that is provided to Google or stored in your Google Account will be used and protected in accordance with the Google Privacy Policy." *Id.*

The disputed data transmissions are not "specific to Chrome." To the contrary, since Google receives the same categories of at-issue data regardless of browser, it disclosed the at-issue data collection in browser-agnostic terms in its Privacy Policy and Account Holder Agreements, not in an expressly Chrome-specific notice. *See* 7-ER-1350–51 ¶6; *see also* 1-ER-20 n.7.

The one exception is the X-Client-Data header. Since that header *is* a "feature[] specific to Chrome," Google disclosed it in the Chrome Privacy Notice. In a section labeled "**Identifiers in Chrome**," the notice describes "identifiers [that]

help us develop, distribute, and promote Chrome." 3-ER-361. The relevant

subsection, labeled "**Field Trials**," explains:

> We sometimes conduct limited tests of new features. Chrome includes
> a seed number that is randomly selected on first run to assign browsers
> to experiment groups…. A list of field trials that are currently active on
> your installation of Chrome is included in all requests sent to Google.
> Learn More.

3-ER-362. Clicking the "Learn More" link took users to Google's "Chrome

Privacy Whitepaper," which explained that these "field trials" "are transmitted using

the 'X-Client-Data HTTP header, which contains a list of active variations.'"

1-ER-23; *see* 2-SER-329–30.

## B.    Procedural History

### 1.    The District Court Denies In Part Google's Motion To Dismiss

Plaintiffs filed suit on the premise that Google's receipt of any data falling

under the broad and technical definition of "personal information" set forth in the

2018 California Consumer Privacy Act ("CCPA")—a law passed nearly a decade

*after* Google published the Chrome Privacy Notice using the language at issue—

violates purported promises in the Chrome Privacy Notice. *See* 8-ER-1552, 1564.

Google moved to dismiss based on, among other grounds, Plaintiffs' consent

to Google's Privacy Policy, which discloses the at-issue collection. Under the

permissive motion-to-dismiss standard, the district court allowed Plaintiffs' claims

to proceed "for two reasons." 3-ER-409. First, it concluded that "a reasonable user

consenting to Google's Terms of Service on or after March 31, 2020, might have concluded that she was not consenting to Google's Privacy Policy" because, as of that date, "Google's Terms of Service explicitly excluded Google's Privacy Policy." *Id.* And second, it accepted Plaintiffs' theory that, upon reading the Chrome Privacy Notice, they might have "assumed that Google would not receive their data while they were not synced." 3-ER-423.

> ### 2. Google Moves For Summary Judgment After Discovery Confirms Plaintiffs Consented To Google's Privacy Policy And Account Holder Agreements, And Never Read the Chrome Privacy Notice

Discovery confirmed each Plaintiff consented to Google's Terms of Service while they expressly *included* the Privacy Policy. 7-ER-1377–79. It further confirmed that each Plaintiff had agreed to one or both of the Account Holder Agreements—disclosures the district court had not considered at the motion-to-dismiss stage because Plaintiffs omitted them from the complaint. *See supra* SOC A.3. Discovery also revealed that Plaintiffs had never read the Chrome Privacy Notice, upon which all their claims—and the motion-to-dismiss order—were based. *See supra* SOC A.3.v. Based on these undisputed facts, Google moved for summary judgment on Plaintiffs' individual claims.

### 3. The Magistrate Judge Admonishes Plaintiffs For Mischaracterizing Evidence In Discovery Disputes.

Plaintiffs tried to thwart Google's summary judgment motion without a resolution on the merits. Between the close of briefing and the hearing, Plaintiffs asked Magistrate Judge van Keulen to sanction Google for purported discovery misconduct. *See* 4-ER-649. They alleged, falsely, that Google had engaged in wide-ranging violations of discovery orders that warranted striking Google's consent defense—thereby mooting its summary judgment motion.[6] 4-ER-691.

The magistrate judge rejected nearly all of Plaintiffs' allegations of misconduct and prejudice. 4-ER-657–58, 661–64, 675–77, 693. The court did find that Google produced two documents approximately three months after it should have, 4-ER-685, but observed that "Google substantially complied" with the fact discovery deadline; Google timely produced 265 other documents on the same topic; and "Plaintiffs did not request an extension of the deadline for their MSJ Opposition to await Google's production of the requested … documents, nor did they seek to supplement their MSJ Opposition with the later-produced documents," 4-ER-679, 685–86, 693. Predictably, Plaintiffs now claim that these two documents are central

---

[6] Plaintiffs sought (unsuccessfully) an additional grab-bag of similarly extreme relief designed to bolster their position in the case notwithstanding the merits, including a finding of civil contempt, a spoliation instruction requiring the jury to draw claim-dispositive adverse inferences against Google, and all fees and costs related to proceedings before the discovery Special Master. 4-ER-690–91.

to their case, Pls. Br. 20, 38, but the record belies that assertion. Plaintiffs did not seek to introduce them into the summary judgment record until *more than seven months after* Google produced them, and nearly three months after the summary judgment hearing. 3-SER-348.

The court denied Plaintiffs' request to bar Google's consent defense, and merely ordered that Google not object to the late-produced documents' admissibility. 4-ER-687, 693–94. In addition to denying the vast majority of Plaintiffs' requested sanctions, Judge van Keulen criticized "Plaintiffs [for] repeatedly mischaracteriz[ing] the record," noting that their "tendency to misstate or exaggerate the record undermines a number of Plaintiffs' arguments." 4-ER-637–39.

### 4. The District Court Conducts A Full-Day Evidentiary Hearing After Plaintiffs Belatedly Argue The At-Issue Data Collection Is Not Browser-Agnostic

In its summary judgment motion, Google explained that its Privacy Policy and Account Holder Agreements govern because the at-issue data collection occurs regardless of browser, 1-SER-51, a fact Plaintiffs' opposition did not contest. Only at oral argument did Plaintiffs argue—for the first time—that there was a material dispute as to whether the at-issue transmissions are "browser-agnostic." 2-ER-321. The district court found Plaintiffs "ha[d] not proffered any evidence to show that there is a genuine dispute in this regard," *id.*, and could then have granted summary judgment for Google. Instead, the court gave Plaintiffs the opportunity to develop "a

more fulsome record" and scheduled an evidentiary hearing pursuant to Federal Rule of Civil Procedure 56(e) to determine whether there existed a genuine dispute about whether "receipt of the at-issue data is … contingent on whether the user is browsing in Chrome." 2-ER-321–22.

At that full-day hearing, the Court heard testimony from three expert witnesses and five Google employees. Google's computer science expert Dr. Georgios Zervas provided an overview of web communications and third-party services. 2-ER-73–87. Dr. Zervas explained that (i) many websites incorporate content or services hosted by third-party providers like Google; (ii) rendering those websites requires the user's browser to send HTTP requests to the third-party service providers to retrieve the requested components; and (iii) those requests follow a universal protocol, common to all browsers, that includes the at-issue data. *Id.* Google employees responsible for Chrome and for Google's ads and analytics products corroborated this testimony, 2-ER-210, 177–79, and Plaintiffs' computer science expert Dr. Zubair Shafiq confirmed its accuracy, *see* 2-ER-119–20.

Dr. Zervas also demonstrated—using both his own data and Dr. Shafiq's—that Google Web Services receive the at-issue data categories from all major browsers in their default settings. 2-ER-88–93. He further showed that when those browsers' settings are adjusted to a similar state, they send an equivalent quantity of data to Google. *Id.* Plaintiffs did not dispute this testimony.

Plaintiffs' experts admitted that Chrome and other browsers send the same (disclosed) categories of data to Google and other third-party web service providers. 4-ER-479–81, 483, 488. They opined only that, due to differing default settings among major browsers, Google may receive different *volumes or granularity* of data depending on those settings.

### 5. The District Court Grants Google's Motion For Summary Judgment

Based on the undisputed facts established in the briefing and at the evidentiary hearing, the district court granted Google's summary judgment motion.[7] 1-ER-30. The court applied the same consent framework Plaintiffs assert it ignored—that "[c]onsent is only effective if the person alleging harm consented 'to the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent." 1-ER-15–16 (quoting Restatement (Second) of Torts § 892A(2)(b)).

The court held that Google met that standard. After describing the relevant notices and agreements in detail—including the Privacy Policy, Account Holder Agreements, and Chrome Privacy Notice—the court concluded that "a reasonable person viewing those disclosures would understand that Google maintains the practices of … collecting its users' data when users use Google services or third

---

[7] Having rejected all of Plaintiffs' individual claims, the court also denied their pending motion for class certification as moot. 1-ER-30.

party sites that use Google services ….” 1-ER-24–25 (citing *Smith v. Facebook, Inc.*, 745 F. App’x 8–9 (9th Cir. 2018)). It then rejected Plaintiffs’ contrary argument that “a reasonable user reading the Chrome Privacy Notice would think that Google blocks all collection of the at-issue data when one uses the Chrome browser.” 1-ER-27.

Far from “dismiss[ing] the express promises that the Chrome Privacy Notice made to users,” Pls. Br. 24, the district court carefully analyzed its plain language and determined that Plaintiffs’ interpretation “completely ignore[s] critical text and read[s] others out of context.” 1-ER-27. Among other things, the district court recognized that the Chrome Privacy Notice is consistent with the at-issue collection, links to the Privacy Policy that explains that collection, and limits its identification of the information that “won’t be sent to Google unless you … sync” to specific “personal information that Chrome stores”—that is, the passwords and autofill information that Chrome stores locally unless the user chooses to store it in their Google account to access it on other devices. 1-ER-27–28.

In addition to concluding that a reasonable person would understand that the at-issue transmissions occur regardless of Sync status, the district court validated Google’s decision to disclose the browser-agnostic data collection in its general disclosures rather than its Chrome-specific notice. 1-ER-19–20. Emphasizing the undisputed testimony that “browser settings are ever-changing,” with the result that

"[s]ome browsers may send more information to Google and some send less," the district court concluded that "Google's disclosure of the at-issue data in browser-agnostic terms … enables Google users, irrespective of the browser used, to know how it is that Google collects and utilizes one's data," without "creat[ing] the impression that this collection only occurs on Chrome…." 1-ER-20 n.7.

Finally, the court carefully considered the internal documents Plaintiffs now claim it disregarded. 1-ER-28–30. Though Plaintiffs focus on the court's incidental remark that some documents they relied on were "untitled and undated draft[s]," *see* Pls. Br. 24, that passing observation had little to do with its ultimate conclusion that internal discussions among some Google employees failed to raise a triable question about Plaintiffs' consent. Rather, the court emphasized that "many of the documents are general in nature and do not address the specific disclosures and/or at-issue data," and others had been taken entirely out of context—rendering them irrelevant to Plaintiffs' consent to the particular conduct at issue here. 1-ER-28.

Like Judge van Keulen's sanctions order, Judge Gonzalez Rogers' summary judgment order criticized Plaintiffs for their serial mischaracterizations, including "mischaracteriz[ing] key deposition testimony" and "misquot[ing] and cherry-pick[ing]" documents in the record. 1-ER-29–30.

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment for Google on all of Plaintiffs' claims because they consented to unambiguous disclosures explaining Google's collection and use of the at-issue data. This Court reached the same conclusion on nearly identical claims in *Smith*—as have numerous other courts in this Circuit confronted with similar allegations. The Court should reject Plaintiffs' attempt to negate their express consent by pointing to cherry-picked statements from the Chrome Privacy Notice. As the district court properly held, the Chrome Privacy Notice cannot fairly be read to state that merely using Chrome without Sync enabled prevents all transmissions of data to Google.

Plaintiffs' attempts to identify a material dispute of fact precluding summary judgment also fail. Although Plaintiffs argue "reasonable users" might have interpreted the Chrome Privacy Notice in the illogical manner alleged in their Complaint, they offer *no evidence* that *any* user actually did so. Indeed, Plaintiffs *themselves* never interpreted the Chrome Privacy Notice that way (having never read the document), and their purported experts offered only inadmissible *ipse dixit* speculating about how "reasonable users" might interpret Google's disclosures, unsupported by surveys, relevant research, or any other objective evidence.

The abstract statements Plaintiffs pluck from internal Google documents cannot fill the void of evidence supporting their core theory. That is because—as the

district court properly held—the documents *do not pertain to the relevant data collection or consent issues*. Nor does Plaintiffs' argument that Google's Web Services are not "browser-agnostic"—an issue Plaintiffs themselves argue is irrelevant to the core inquiry—preclude summary judgment. Plaintiffs quibble only with the district court's *definition* of "browser-agnostic," not with any fact material to its decision. This Court should affirm.

## ARGUMENT

### I.     PLAINTIFFS CONSENTED TO THE AT-ISSUE DATA COLLECTION

Plaintiffs admit, as they must, that "consent is an affirmative defense to the claims against Google." Pls. Br. 29; *see* Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it); 1-ER-15–16 (collecting authority establishing that consent defeats each of Plaintiffs' claims). "In determining consent, courts consider whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Smith*, 745 F. App'x at 8. Here, the disclosures to which Plaintiffs agreed unambiguously informed users that Google would receive the data transmissions at issue. By assenting to those disclosures, Plaintiffs consented to the conduct they challenge.

## A. Plaintiffs Agreed To Clear Disclosures Explaining Google Receives The At-Issue Data When Users Interact With Its Web Services

Google's Privacy Policy and Account Holder Agreements expressly disclosed all the conduct Plaintiffs challenge here: Google's receipt of data reflecting activity on websites that use Google's Web Services and use of that data to personalize advertisements. *See supra* SOC A.3.i. Indeed, the Privacy Policy stated expressly that Google "collect[s] information about the services that you use and how you use them, like when you … visit a website that uses our advertising services, or view and interact with our ads and content," and also provided detailed, plain-language explanations of each category of data at issue—including "device-specific information," "internet protocol address," "cookies that may uniquely identify your browser or your Google account," and "activity … from your visits to sites and apps that partner with Google." *Id*.

Likewise, the Consent Bump Agreement explained, *inter alia*, that "[a]s you use [] sites [that use Google Web Services], your web browser may send certain information to Google that may include the web address of the page that you're visiting, your IP address, or cookies previously set by the site or Google." 7-ER-1361 ¶25. It further stated that if users clicked "I AGREE"—which Plaintiffs did—"activity from sites and apps that partner with Google" will be stored in their accounts and "use[d] … to make ads across the web more relevant for you." 7-ER-1356–57 ¶19. The New Account Creation Agreement—to which Plaintiffs

also clicked "I AGREE"—similarly disclosed that Google receives and processes the at-issue data "when you use apps or sites that use Google services like ads, Analytics, and the YouTube video player," including to "[d]eliver personalized ads … on Google services and on sites and apps that partner with Google." 7-ER-1368–77 ¶¶34–37, 43.

A reasonable person would understand these disclosures mean what they say: Google receives the at-issue data when users visit websites incorporating Google Web Services. Since it is undisputed that each Plaintiff agreed to both the Privacy Policy and one or both of the Account Holder Agreements, *see supra* SOC A.3, the district court correctly held that Plaintiffs expressly consented to the collection and use of the at-issue data. *See* 1-ER-25.

This Court reached the same conclusion on virtually identical facts in *Smith*. *See* 745 F. App'x at 8. There, the plaintiffs alleged that Facebook's collection of activity data when users visited websites that had installed Facebook's web services—and Facebook's use of that data for personalized advertising—violated the Federal Wiretap Act, California Invasion of Privacy Act, California Constitution, and California tort law. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017). The transmissions at issue in *Smith* were materially indistinguishable

from those in this case.[8] As here, Facebook received the at-issue data because website publishers "embed[] a code snippet that Facebook provides" such that a "visitor's browser makes two GET requests"—one "to load the page" followed by another "to Facebook's servers," which "respond[] with code that makes the button appear on the page." *Id.* at 948.

The Court affirmed dismissal of the *Smith* plaintiffs' claims, holding they had "consented to Facebook's data tracking and collection practices" when they agreed to Facebook's policies and terms. Those terms disclosed, in relevant part:

> "We collect information when you visit or use third-party websites and apps that use our Services.... This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us," and "we use all of the information we have about you to show you relevant ads."

*Smith*, 745 F. App'x at 8. The Court concluded that "[a] reasonable person viewing those disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." *Id.* at 8–9. That clear consent, *Smith* explained, was sufficient even without disclosure of every specific circumstance in which it continued to apply. *Id.* (holding that collecting "sensitive" browsing data concerning visits to

---

[8] As here, the data at issue in *Smith* consisted of the URL of the page visited (as part of the referer header), IP addresses, cookies, and user-agent information. *Smith*, 262 F. Supp. 3d at 954.

health-related websites "falls within the scope of Plaintiffs' consent" to "collect information when you visit or use third-party websites … that use our services"). After all, "a contractual term is not ambiguous just because it is broad." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964 (9th Cir. 2010).

The same reasoning applies here. Even without specifying that its standard data-collection practices occur when one uses Chrome without its Sync feature enabled (*i.e.*, in Chrome's *default* mode), Google obtained consent "to collect information about the interaction of [users'] apps, browsers, and devices with [Google] services, including IP address … and referrer URL of [the] request." 7-ER-1384 ¶56. Contrary to Plaintiffs' repeated assertion that Google's detailed disclosures were unduly vague or sought "blanket" consent, Google's surrounding disclosures far exceed the specificity *Smith* held was sufficient to consent to the precise type of data collection and use that Plaintiffs challenge. *See supra* SOC A.3. Google's Privacy Policy and Account Holder Agreements—to which all Plaintiffs affirmatively agreed—establish consent as a matter of law.

Consistent with *Smith*, district courts in this Circuit have routinely held that plaintiffs consented to providers' receipt of data based on disclosures similar to (or more general than) those Plaintiffs assented to here. In *Silver v. Stripe*, for instance, a court rejected wiretapping claims in connection with a web service provider's receipt of browsing data—including IP address, geolocation, device and browser

type, and even the user's precise mouse movements and keystrokes—because the website's privacy policy disclosed that third-party partners would "use various technologies" to "collect information about your online activity over time and across different websites or online services." 2021 WL 3191752, at *1–4 (N.D. Cal. Jul. 28, 2021). Likewise, the court in *Javier v. Assurance IQ, LLC* dismissed privacy claims against a third-party activity-tracking service where the privacy policy disclosed that "third party service providers [may] monitor[] and analyz[e] Site activity." 2021 WL 940319, at *2–4 (N.D. Cal. Mar. 9, 2021).[9] This Court should reaffirm these common-sense consent principles, which have guided similar decisions for nearly a decade.

As the above authority illustrates, Plaintiffs' repeated insistence (at, *e.g.*, Pls. Br. 29–31) that consent must be "about the specific practices at issue" or meet some standard under which any misunderstanding is effectively impossible, is a red herring. Plaintiffs' undisputed agreement to the detailed, straightforward disclosures in the Privacy Policy and Account Holder Agreements plainly *is* consent "to the

---

[9] *See also, e.g.*, *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1135–37 (N.D. Cal. 2015) (dismissing CIPA claims where Privacy Policy states that "we may share your personal information with our agents, representatives, contractors and service provider"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212–13 (N.D. Cal. 2014) (Koh, J.) (dismissing Wiretap Act claim arising from LinkedIn's collection of plaintiffs' Google contacts where Plaintiffs assented to a disclosure explaining "Linkedin.com is asking for some information from your Google account" followed by a bullet point that reads "Google Contacts").

particular conduct, or substantially the same conduct" they now challenge. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012) (quoting Restatement (Second) of Torts § 892A(2)(b)). And a reasonable person would plainly understand what that consent meant. Given the comprehensiveness and clarity of Google's Privacy Policy and Account Holder Agreements, this case presents nothing close to a situation where "disclosures did not specifically notify users" of the at-issue collection, Pls. Br. 30, or where—as Plaintiffs colorfully posit—combatants "consent to a fight with fists" and then "bit[e] off a finger," *id.* at 31 (quoting Restatement (Second) of Torts § 892A(2) cmt. c).

Plaintiffs' reliance on *Brown v. Google*, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023)—a decision that expressly distinguished this case, *id.* at *9—is similarly misplaced. The *Brown* Plaintiffs specifically alleged that Google's collection of the at-issue data in Chrome's and other browsers' default browsing modes (*i.e.*, the collection at issue here) is "common knowledge." The court declined to hold that Google's general Privacy Policy barred the *Brown* plaintiffs' claims because they challenged only the collection of data when they used Chrome's "private browsing mode" (called "Incognito"), which, unlike Sync, is described as a "way[] to manage your privacy" and to "browse privately." The district court found users might reasonably have concluded that Google's general policies did not apply when they enabled a browser's "private" mode. *Id.* at *1–2, 8. *Brown*'s reasoning does not

extend to this case, in which Plaintiffs allege they browsed in Chrome's *default mode* (or while signed in to Google) without enabling any privacy settings.

Indeed, the court in *Brown* reaffirmed that companies need not always "enumerate every mode, setting, or circumstance impacting—or not impacting—th[e] [at-issue] data collection," pointing to this case as an example. *Id.* at *7–9 & n.14. Far from supporting Plaintiffs' position, *Brown* illustrates the absurdity of their case: Chrome offers a private browsing mode, but the Plaintiffs here chose not to use it. Instead, they claim to have expected Chrome to block all transmissions to Google by default. They offer no evidence to support that alleged expectation, and it is fundamentally at odds with the disclosures they were shown and to which they consented.

### B.    The Chrome Privacy Notice Does Not Negate Plaintiffs' Consent

Urging the Court to distinguish *Smith* and disregard Google's unambiguous disclosures, Plaintiffs argue the Chrome Privacy Notice contradicted those disclosures by "affirmatively promis[ing] Chrome users that their personal information would not be sent to Google unless they agreed to sync their accounts." Pls. Br. 32. That argument is implausible on its face. Sync has nothing to do with either Google's Web Services *or* user privacy, and Google has never represented otherwise.

Plaintiffs' claims further unravel upon examination of the evidence. The "promises" on which they rely exist nowhere in the Chrome Privacy Notice. As the district court correctly recognized, Plaintiffs infer them only by "completely ignor[ing] critical text and read[ing] other[ language] out of context." 1-ER-27. Even Plaintiffs admit that the question before this Court is how a "Chrome user would understand Google's disclosures *when taken as a whole*," not from sentence fragments read in isolation. Pls. Br. 42 (emphasis added); *accord Smith*, 745 F. App'x at 8. In context, it is clear Google never promised users could avoid the transmissions described in the Privacy Policy and Account Holder Agreements simply by using Chrome in its default mode. Certainly the Chrome Privacy Notice could not have negated *these* Plaintiffs' express consent—they all admit they never read it.

### 1. Plaintiffs Did Not Read The Chrome Privacy Notice

Plaintiffs each admitted in discovery that they did not review *any* of the Chrome Privacy Notice before filing suit, much less the cherry-picked statements they later adopted to justify their claims. Instead, they pivoted away from their Complaint's central theory, implausibly claiming they believed Chrome would actively block all data transmissions to Google based exclusively on "Google's *use*

*of the word Sync*" on the button in Chrome that enables the feature.[10] 1-SER-84–85 (emphasis added).

The Court should not permit Plaintiffs to escape the disclosures they actually viewed and acknowledged based on an opportunistic misreading of other documents they admit they never read. Because Plaintiffs agreed to the Privacy Policy and Account Holder Agreements—and never reviewed the document they now allege contradicts them—"the circumstances, considered as a whole, demonstrate that a reasonable person understood that [the challenged] action would be carried out." *Smith*, 745 F. App'x at 8.

### 2. The Chrome Privacy Notice Does Not Promise Google Will Not Receive The Data At Issue

In any event, the Chrome Privacy Notice cannot reasonably be interpreted to state that a user's Sync setting affects Google's collection and use of the disputed data. *First*, the two statements Plaintiffs selectively quote (at Pls. Br. 14, 33) cannot support the interpretation that using Chrome in its default state (without Sync enabled) blocks the transmissions described in the Privacy Policy and Account Holder Agreements. That "[y]ou don't need to provide any personal information to

---

[10] The Sync button, which was introduced only in June 2018—mid-way through the putative Class Period and long after Plaintiffs began using Chrome—has always appeared immediately below text that reads "Sync and personalize Chrome across your devices," making explicit that Sync is a personalization feature, not a privacy tool. 7-ER-1392–94 ¶¶72–74.

use Chrome," 3-ER-357, plainly (and accurately) explains that users can download Chrome and begin browsing the web without providing their name and contact information, creating a Google Account, or signing in. *See* Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense…."). It cannot reasonably be read to mean Chrome blocks all data transmissions to Web Services. As Plaintiffs' own privacy expert testified, the Chrome Privacy Notice "used personal information in a colloquial[] sense here" and refers to "personal information" as information "to help you fill out forms and sign into sites you visit."[11] 5-SER-1058. That, of course, is not the at-issue data.

Nor does the statement that "[t]he personal information that Chrome stores won't be sent to Google unless you choose to store that data in your Google Account by turning on sync" contradict Google's unambiguous disclosure of the at-issue data collection. Plaintiffs tacitly recognize as much by repeatedly quoting only the second half of the statement, in order to substitute their own misleading gloss on what, exactly, "won't be sent to Google unless you … sync." *See* Pls. Br. 1, 25, 28, 33, 41, 45, 47 (omitting "[t]he personal information *that Chrome stores*" from the Chrome Privacy Notice and substituting broader phrases like "personal information" or "a

---

[11] Plaintiffs' expert also admitted users would not understand the term according to a broad legal definition like the one Plaintiffs urge the Court to use. 5-SER-1052 ("If you walked into the streets of San Jose and asked somebody what the CCPA definition of personal information is, they would look at you like you were crazy.").

wide range of information, including browsing histories and cookies"); *see also id.* at 11 (falsely referring to "the Chrome Privacy Notice's assurances that *no data would be sent to Google* unless synced" (emphasis added)). Plaintiffs cannot conjure a factual dispute by misrepresenting what the Chrome Privacy Notice says.

Reading the notice in proper context reinforces its incompatibility with Plaintiffs' post-filing interpretation. The immediately preceding passage clarifies that the *only* data subject to this limitation is the specific personal information "[t]he basic browser mode stores … locally on your system." 3-ER-357–358. But the at-issue data is not "the personal information that Chrome stores" (*i.e.*, the information "store[d] locally on your system" that "help[s] you fill out forms or sign into sites you visit"), but rather the separate data Google receives when users interact with websites that use Google's Web Services. *See* 1-ER-28. Indeed, the very next paragraph of the Chrome Privacy Notice (called "How Chrome handles your information") states that "[s]ites that you visit using Chrome will automatically receive standard log information, including your system's IP address and data from cookies." 3-ER-358; *see also* 3-ER-367 ("Like most websites, our servers automatically record … web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.").

Putting the issue further beyond doubt, *all* disclosures at issue—including the Chrome Privacy Notice—refer to Sync data and the at-issue data as *two distinct sets of information*. The Privacy Policy identified "Activity on third-party sites and apps that use our services" as a separate data source from "Chrome browsing history you've synced with your Google Account." *See supra* SOC A.3.i. The Account Holder Agreements did the same. *See supra* SOC A.3.ii. And the Chrome Privacy Notice explained that users can choose whether to "allow[] your Chrome history to be included in your Google Web & App Activity," reinforcing that Google receives Web & App Activity data from Web Services *irrespective of Sync status*. 3-ER-363. Confronted with these disclosures, Plaintiffs' own expert conceded that "syncing your account with Chrome" and "visits to sites and apps that partner with Google" are "two separate points" and "reasonable people would see th[em] as two different points." 5-SER-1064–65. That admission, which speaks directly to the applicable consent framework, is dispositive.

*Second*, the Chrome Privacy Notice does not purport to govern the conduct Plaintiffs challenge. That notice is a product-specific publication expressly limited to "features that are *specific to Chrome*." 7-ER-1350–51 ¶6 (emphasis added); 3-ER-357. Sync is such a feature, but the ability to browse websites that use Google's Web Services plainly is not. As the Privacy Policy clearly explains, "[w]e collect information … when you … visit a website that uses our advertising services, or

view and interact with our ads and content," actions that a reasonable person would understand can be done in *any browser*. 7-ER-1379 ¶51. Indeed, "browser type" is one of the data categories Google discloses it collects. *Id.* ¶¶51, 56.

## C. The Judgment Does Not Turn On Technical Knowledge

Plaintiffs and their *amici* criticize the district court's reasoning on the basis that it purportedly "adopted a novel consent framework" that ignored user expectations and "ma[de] behind-the-scenes operations and mechanics the primary focus of the consent inquiry." Pls. Br. 26; *see also* Texas Br. 11 (asserting the district court adopted an "expert-analyst approach" rather than a "reasonable-user approach"). That is false.

Indeed, Plaintiffs acknowledge that the district court articulated the correct standard for consent. Pls. Br. 42 ("the district court recited the correct background principles"); *see also* Texas Br. 15 (the court "started in the right place" and "correctly explained" the consent standard).[12] And there can be no genuine dispute that it applied that standard to the facts of the case. To assess whether Plaintiffs' "consent was … legally sufficient," the district court considered the text of each

---

[12] The Texas *amici* speciously claim (at Texas Br. 15) that the district court "failed to mention the reasonable-user standard" and "[t]his omission caused its analysis to go astray," but *the same brief* elsewhere recognizes that "the court itself … acknowledged [that] it needed to decide how 'a reasonable person' would understand Google's disclosures," *id.* at 9. That is exactly what the court did. *See* 1-ER-24–25 (evaluating consent based on what "a reasonable person viewing those disclosures would understand").

disclosure at issue—including its "level of specificity" and what "a reasonable person viewing those disclosures would understand." 1-ER-25; *see* 1-ER-27–28 (considering what "a reasonable user reading the Chrome Privacy Notice would think" based on its "express language"). Put simply, the court conducted the very analysis Plaintiffs argue it should have. *See* Pls. Br. 43–44 (arguing "the court was supposed to … evaluate whether, from the perspective of a reasonable user, Google unambiguously disclosed" the conduct at issue).

Plaintiffs' attempt to read that analysis out of the decision is unavailing. To be sure, the district court *did* examine the technology at issue, *see* 1-ER-17–19, but Plaintiffs misstate the role that "technical" inquiry played in the decision. The court addressed technical issues only to address *Plaintiffs'* belated arguments that the data collection is unique to Chrome and should therefore have been disclosed in the Chrome Privacy Notice rather than the Privacy Policy and Account Holder Agreements. 2-ER-321–22. The court's decision summarized the evidence presented at the hearing (some of it technical) to explain its conclusion that the material facts were undisputed. 1-ER-16–19.

When it came time to evaluate whether Google appropriately *disclosed* that data collection—and, by extension, "[w]hether the [c]onsent is [l]egally [s]ufficient"—the court's analysis focused *solely* on how a reasonable person in Plaintiffs' position would understand the "express language" of the four disclosures

at issue (including the Chrome Privacy Notice). 1-ER-24–28. In other words, the court's "technical" analysis did not examine what Google's disclosures mean, but rather confirmed that those disclosures were *accurate*: *i.e.*, that (i) the conduct Google disclosed in browser-agnostic terms did occur regardless of browser, and (ii) the conduct Google identified as Chrome-specific was specific to Chrome.

At most, then, Plaintiffs argue the district court conducted a superfluous inquiry that confirmed the result of its consent analysis. But that is no basis for reversal. After all, this Court "may affirm on any basis supported by the record." *Jones v. Slade*, 23 F.4th 1124, 1133 (9th Cir. 2022); *Thompson v. Paul*, 547 F.3d 1055, 1058–59 (9th Cir. 2008). The record—and the district court's decision— provide ample basis to affirm.

## II.    THE MATERIAL FACTS ARE NOT IN DISPUTE

Plaintiffs argue that the district court's determination of how a reasonable user would understand Google's unambiguous disclosures usurped the jury's role by (i) ignoring evidence ostensibly favoring their self-serving interpretation and (ii) "assum[ing] that Google's data collection was 'browser agnostic'" despite a putative factual dispute. Neither argument has merit.

*First*, while Plaintiffs suggest that consent is an issue that must always go to the jury, there is no legal support for that proposition, as cases like *Smith* make clear. The question instead is whether there is a material factual dispute on the dispositive

question of how reasonable users would interpret Google's disclosures. And despite ample opportunity, Plaintiffs offered no evidence on that point. Instead, they relied on inadmissible speculation by putative experts who chose *not* to investigate user expectations, and internal Google documents immaterial to the sufficiency of Plaintiffs' consent. *Second*, the challenged data collection is indisputably browser agnostic in every *material* sense: it occurs in all browsers and is thus appropriately disclosed in browser-agnostic terms. That different browsers may send a different volume or granularity of data depending on their settings—undisputed facts acknowledged by Google's experts and the district court alike—is immaterial to the accuracy of Google's disclosures and the effectiveness of Plaintiffs' consent. The district court correctly rejected Plaintiffs' attempts to manufacture factual disputes. This Court should do the same.

## A. Plaintiffs' Evidence Fails To Raise A Material Question Of Fact

Plaintiffs assert the district court erred by disregarding two sources of evidence supporting their position: (i) "[t]he plaintiffs' expert evidence," and (ii) internal discussions of privacy features and related consents by Google employees. *See* Pls. Br. 14–16, 37–41, 52–54. Neither raises a material dispute about Plaintiffs' consent.

### 1. Plaintiffs' Experts Offer No Evidence To Support Their Interpretation Of Google's Disclosures

Plaintiffs argue (at Pls. Br. 40) that testimony from their privacy expert Joseph Turow and survey expert Leslie John supports their conclusion that Google's "disclosures failed to clearly communicate" the data transmissions at issue. But their experts offered no evidence of how reasonable Chrome users would understand Google's disclosures—instead offering only unsupported and inadmissible *ipse dixit* insufficient to create a triable issue as to Plaintiffs' consent.

*First*, neither expert conducted a survey or any other research into "reasonable users'" expectations or interpretations of Google's disclosures. *See, e.g.*, 5-SER-1028–29, 1069–70 (Turow Tr.); 5-SER-962, 977–79, 983–85, 999–1000 (John Tr.); *see also* 5-SER-1033–34, 1043, 1073 (Turow admitting he had never conducted surveys or other research concerning Google disclosures or products); 5-SER-988–991 (John admitting same). Instead of citing objective evidence, Professor Turow admitted his opinions of how "reasonable users" would understand Google's disclosures are based on nothing more than his personal "sensitivity to language" from being an "English major," and reading Google's disclosures "very closely."[13] 5-SER-1020. Thus, the purported "expertise [he is] offering" is simply

---

[13] As Professor Turow admitted, this "methodology" is "not something I do as an everyday part of my work." 5-SER-1024.

that of "a person who reads the plain language in the documents"—a task he admitted the Court is equally capable of undertaking.[14] *Id.* at 116:23–117:15.

Professor John similarly offered no independent research or methodology to support her speculation that reasonable users expect Chrome to block all data transmissions to Google by default. *See* Dkt. 425 at 7–10; *see also* 5-SER-994–95 (testifying only that "*it's hard for me to see* how people would come to the conclusion that when they don't [sync] that all this information will be shared" (emphasis added)). This lack of support is inexplicable given that Professor John is a *survey expert* who testified that she conducts hundreds of user expectations surveys each year and that surveys are often how an expert in her field would gauge reasonable user expectations. 5-ER-952–73.

Plaintiffs criticize the district court for rejecting their alleged interpretation of the Chrome Privacy Notice "just based on [the court's] own reading of the disclosures and evidence" Pls. Br. 50, while simultaneously arguing that their retained experts' "own reading" may be substituted for that of reasonable consumers. They are wrong. Their experts' self-serving testimony is not even admissible, much

---

[14] *See also* 5-SER-1044, 1047–48 (testifying that "I think if the judge … read everything that I read, she would come, or he, to the same conclusion," but that "judges have more important things to do," than look at all the documents and "suggest what the meaning is").

less probative of how reasonable users would understand Google's disclosures.[15] *See Nieves Martinez v. United States*, 997 F.3d 867, 877 n.1 (9th Cir. 2021) ("At summary judgment, courts may decline to consider 'unsupported speculation and subjective beliefs' in expert testimony and testimony that is not founded in fact."); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are … inappropriate material for consideration on a motion for summary judgment[;] … conclusory opinions are similarly inappropriate.").[16]

Moreover, neither expert opined on—or even reviewed—the Account Holder Agreements that all Plaintiffs expressly accepted. 1-SER-28–29, 32–33;5-SER-1004, 1007–09, 1036, 1039–40. Each of those agreements, which disclose the data collection at issue *and* distinguish between that data and the data Google receives from Sync, was an independent basis for the decision below. *See* 1-ER-22–23.

---

[15] Plaintiffs' experts' conclusion that Chrome's "user interface"—*i.e.*, the browser itself—does not "explain … what kind of data is collected and sent," Pls. Br. 40–41, is irrelevant because each Plaintiff expressly consented to multiple disclosures that did explain that data collection.

[16] *See also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (expert testimony inadmissible where expert "did not identify [an] objective source, or demonstrate that he followed a scientific method embraced by at least some other experts in the field"); *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (affirming exclusion where expert conclusions were based on "mere subjective beliefs or unsupported speculation").

## 2. Google Employees' Statements And Internal Discussions Are Not Material To Plaintiffs' Consent

Plaintiffs spill much ink on statements by Google employees and internal documents that cannot raise a triable issue as to Plaintiffs' consent. As an initial matter, the only question before the Court is whether the disclosures Plaintiffs accepted are legally sufficient to notify them of the challenged data collection. The relevant terms of those agreements are unambiguous on their face, and more than adequate to obtain consent under the analysis this Court applied in *Smith*. *See supra* Argument I.A. Testimony or internal exchanges among certain Google employees— especially discussions that "are general in nature and do not address the specific disclosures and/or at-issue data," 1-ER-28—have no bearing on the legal effect of Plaintiffs' unambiguous consent. *See Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398 n.3 (9th Cir. 1985) (holding defendant's chairman's "opinion as to the correct construction of the [contract]" is "an inadmissible legal conclusion" and not "a party admission"). In any event, such "[e]xtrinsic evidence [cannot] … be used to contradict unambiguous express contractual terms" like the disclosures at issue here. *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1051 (9th Cir. 2011).

Even if such evidence *could* bear on the legal sufficiency of Google's disclosures, Plaintiffs offer nothing to call their consent into question—much less validate their unfounded belief that not enabling Sync would cause Chrome to block

all transmissions to Google. Though Plaintiffs assert (at Pls. Br. 3, 14–15) that "Google's own employees who worked on Chrome shared [Plaintiffs'] understanding" of Google's disclosures, they cite *no testimony* from Google employees interpreting those disclosures. And, consistent with their practice throughout the case, *see* 1-ER-29, they mischaracterize the testimony they do cite.

Chrome product manager Sabine Borsay's testimony that Chrome does not send what Plaintiffs call "browsing history and other personal information" refers only to the specific data available to Sync, not to the at-issue data. In portions of her testimony Plaintiffs did not cite, Ms. Borsay clarifies that she does not endorse Plaintiffs' conflation of those two data sources. *See* 1-SER-9 ("It depends on the context what you mean by 'personal information' here … [a]nd I think you talked about other user data; you would need to specify before I would be able to comment on other user data or what you were referring to."); 1-SER-11 ("[I]f a user turns off Chrome Sync … Chrome does not send Chrome browsing history."); *see supra* SOC A.2 (explaining difference between Chrome browsing history and at-issue data). Likewise, Chrome's Trust & Safety lead was well aware that Google receives the at-issue data when Chrome is in its default state.[17]

---

[17] *See* 7-ER-1323–24 ("[T]he script, which is running in the browser process will … quer[y] some information that are available to any web page using any modern web browser … and then sends this information back to the server that will then, you know, send it back to the entity that embedded that script in the web page."); 7-ER-

The internal documents Plaintiffs rely on are similarly immaterial and unhelpful to Plaintiffs. None concerns the disclosures or data flows at issue here, and some do not concern Google's representations to users at all. Indeed, after carefully reviewing those documents, the district court concluded that Plaintiffs had blatantly mischaracterized them. 1-ER-28–30.

For instance, Plaintiffs claim "Google insiders admitted that Google was simply 'not in a position' to promise not-synced Chrome users that their 'browsing data' would 'never [be] used' for commercial purposes … or that 'tracking is off by default.'" Pls. Br. 37 (quoting 5-ER-942). But Google never made those promises—indeed, it clearly discloses the opposite. *See supra* SOC A.3. As the full document reveals, Plaintiffs have simply cherry-picked from a list of statements the authors would someday "*like* to be able to make." 5-ER-942. Plaintiffs further mischaracterize the same document—which makes no reference whatsoever to Sync—as discussing promises to "not-synced Chrome users." Pls. Br. 37.

Plaintiffs' reliance on snippets of documents and interviews from an internal privacy research initiative is similarly misguided. They emphasize (at Pls. Br. 38–39) certain employees' general concern that Google's "approach … makes it difficult for people to understand how we use their data in *all* circumstances,"

---

1330 ("Whether it is Chrome or any web browser … some information is sent to Google maps").

4-ER-546 (emphasis added), but the only question here is whether Plaintiffs consented in *these* circumstances. Indeterminate questions about Google's general "approach" cannot possibly affect a factfinder's interpretation of the specific, concrete disclosures Plaintiffs actually reviewed and agreed to here.[18]

The vague and undeveloped "related concerns" Plaintiffs excerpt from interview notes (at Pls. Br. 39–40) are likewise unmoored from the issues in this case. It is irrelevant to Plaintiffs' consent whether certain employees believed some "stakeholders at the company … think that [privacy] is impossible or too hard to do," that "[t]here is no coherent and simple access to privacy controls across all apps," or that it might "creep people out to know how much we are paying attention." *See* Pls. Br. 39. Plaintiffs do not allege they used any "privacy controls" (they claim to have used Chrome's default state, *without* enabling any privacy features). In any event, none of the interviews Plaintiffs cite mentioned users' expectations about data Google receives in connection with Web Services or the effect of Sync status on that collection. *See generally* 4-ER-551–622.

---

[18] In any event, *the same paragraph* makes clear that "Google's consent approach[] *enable[s]* the broad collection and use of personal data." 4-ER-546 (emphasis added). The "challenge" the document refers to is *not* that Google collects data without users' consent, but rather that users may prefer the opportunity to give "granular[] and purpose specific[]" consent instead of "binary and far-reaching" consent. 4-ER-546–47.

Only one of the documents Plaintiffs cite remotely concerns Sync-related consents, but that document addresses solely "consents around how Chrome history may be used" once Sync is enabled—in other words, whether users who *have turned on* Sync understand how Google uses their Synced data. *See* 5-ER-952. It has nothing to do with Plaintiffs' claims in this case—which are rooted firmly in their decision *not* to enable Sync.

The district court reviewed this record and correctly held that these internal documents "fail[ed] to establish a triable issue of fact as to whether plaintiffs consented to the at-issue conduct" because they either "do not address the specific disclosures and/or at-issue data," or fail to support Plaintiffs' attorney argument. 1-ER-28–29. Plaintiffs now attack that decision because "issues of credibility" are for the jury and not the court, Pls. Br. 53—but that fundamentally misunderstands the basis for the decision. The court did not find the internal documents were not *credible*; indeed, it expressly "view[ed] the documents in favor of plaintiffs." 1-ER-29 n.13. Rather, it determined that those documents were not *probative*. It is axiomatic that "[i]f the [nonmoving party's] evidence is … not sufficiently probative … summary judgment may be granted." *In re Apple Computer Securities Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)); *see also, e.g.*, *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009) (affirming summary judgment where nonmovant

"did not meet its burden of producing evidence that is significantly probative or more than 'merely colorable'"). That is exactly the case here. Plaintiffs cannot negate clear consent to the specific at-issue conduct by reference to indeterminate concerns.

Allowing Plaintiffs to evade summary judgment based on general internal discussions about Google's consent processes would also set a dangerous precedent. If internal discussion and criticism were sufficient grounds to negate users' consent and expose a company to substantial liability, it would have a significant chilling effect on internal dialogue designed to promote user privacy. While Plaintiffs falsely paint internal documents as "reveal[ing] that the company's consent flow was hopelessly broken," Pls. Br. 19, they actually demonstrate that Google employees care about their users and strive continuously to improve Google's disclosures and consent processes across a range of products and technologies for a large and diverse user base. *See* 4-ER-545–46 ("In the future, we aspire to serve our users even better…. we believe privacy is a universal right, and respecting our users is one of our core values."); 4-ER-549 ("Google as a whole is already aligned around improving user trust…."). Reasonable minds may disagree on how best to achieve that balance, but frank, abstract discussions do not undermine the legal sufficiency of the specific disclosures to which Plaintiffs consented.

## B.  The Challenged Data Collection Practices Are Browser-Agnostic

Finally, Plaintiffs argue that the district court erred in concluding that the challenged data transmissions are "browser-agnostic" because the data Google receives from different browsers may vary in "amount, depth, and detail." Pls. Br. 21, 54. But far from raising a material dispute, Plaintiffs fail to identify a dispute at all.[19] Both parties—and the decision below—agreed that the data Google (and other third-party service providers) receive may vary to some extent depending on browser settings. Those differences, however, are immaterial to the accuracy of Google's disclosures and the sufficiency of Plaintiffs' consent. Because Google receives some form of the at-issue data regardless of browser, it was appropriate and necessary to disclose those transmissions categorically in disclosures that apply to all browsers, not just Chrome.

As Plaintiffs' expert Dr. Shafiq acknowledged, Google can and does receive data from each category at issue—apart from the X-Client-Data header, which is disclosed in the Chrome Privacy Notice because it is unique to Chrome—from browsers other than Chrome. *See* 4-ER-479–80 (IP address and user-agent);

---

[19] Indeed, despite claiming that whether the at-issue data transmissions are browser-agnostic is a factual dispute that precludes summary judgment, Plaintiffs themselves argue that the dispute is immaterial. *See* Pls. Br. 49, 54 (calling the issue "irrelevant to establishing consent here"). While the district court was correct that Google's Web Services *are* browser-agnostic, Google agrees that this Court need not reach the issue to affirm the district court's judgment based on the disclosures alone.

4-ER-480–81, 483 (cookie identifiers); 4-ER-488 (GET and POST requests including URLs). Plaintiffs' own activity data corroborates this testimony, and confirms that Google received the at-issue data when Plaintiffs interacted with Google Web Services in each of Chrome, Safari, Edge, and Firefox. 4-ER-489.

Plaintiffs' only response to this undisputed evidence is that—while Google *does* receive the at-issue data from all browsers—"no two browsers have the same [default] behavior." Pls Br. 55 (quoting 2-ER-242). They highlight evidence that other browsers in their default settings may send a less informative (*i.e.*, "masked") IP address, send less detailed user-agent information, or block certain cookies by default. *Id.* That is, different browsers may transmit the same categories of at-issue data to Google in different ways or amounts. But these so-called "quantitative[]" and "qualitative[]" differences are wholly irrelevant to the consent inquiry. Both Plaintiffs' claims and Google's disclosures are framed in terms of the *categories* of information Google may receive, not the amount or granularity of data available to Google within each category.

Moreover, the browser settings that may cause these variations are not immutable. As Plaintiffs' experts agreed, not only do browsers' default settings change over time, *see* 4-ER-474–75 (Dr. Shafiq's testimony that Safari "wasn't [masking IP addresses] a couple years ago"), but individual users can change those settings depending on their particular preferences, *see* 2-ER-293 (Mr. Smith's

testimony that users "can go in and change … the defaults"). In other words, it is not the *browser* that dictates what data Google receives when a user interacts with third-party web services, but rather the particular settings the user has chosen to enable (or not to enable). *See* 2-ER-92–95 (Dr. Zervas's unrebutted testimony that users can configure Chrome to approximate other browsers' default settings and vice versa). Google's disclosures must account for the fact that browser default settings continuously change based on publishers' and users' choices, such that any browser is capable of sending varying quantities of the data at issue. It was thus accurate—and necessary—to disclose the at-issue collection in browser-agnostic terms.

The district court's decision held exactly that. Contrary to Plaintiffs' protests on appeal, the district court fully credited their testimony that Google might not receive identical data from all browsers, acknowledging that because "browser settings are ever-changing and default settings have evolved over time…. [s]ome browsers may send more information to Google, and some send less…." 1-ER-20 n.7. But as the decision explained, this variance actually *reinforces* the sufficiency of Google's disclosures. That is because disclosing "the at-issue data in browser-agnostic terms, rather than by specific browser, enables Google users, irrespective of the browser used, to know how it is that Google collects and utilizes one's data." *Id.* If, on the other hand, "this collection [were] disclosed in Chrome's Privacy Notice, as plaintiffs suggest, [it] could create the impression that this collection only

occurs on Chrome and not on other browsers." *Id.* Put differently, the undisputed evidence that browsers' default settings may differ is not a basis to reverse the summary judgment decision, but cumulative evidence in support of the judgment.

## III. PLAINTIFFS' FRAMEWORK WOULD FRUSTRATE EFFORTS TO CRAFT USEFUL DISCLOSURES

The standard Plaintiffs and their *amici* urge would not only be contrary to law, it would also undermine web service providers' ability to obtain meaningful consent. Useful disclosures concerning complex technologies reflect a careful balance of clarity, detail, and comprehensibility. As Plaintiffs' own *amici* caution, excessively lengthy or technical disclosures may impede user trust and understanding. *See* EPIC Br. 28 (criticizing "dense, incomprehensible, and extremely long disclosures"); AAJ/CAC Br. 17 ("There is literally no limit on the length and complexity or the layers of menus and hyperlinks that drafters can build into [online privacy policies]."); Texas Br. 14 (expressing concern that "privacy policies, even if truthful, can be buried in masses of text").

Google's disclosures strive to avoid these pitfalls by explaining concepts with simple terms and illustrative examples, fronting key information, and reinforcing the disclosures with additional information and email reminders to view the actual data Google has collected. *See supra* SOC A.3. Indeed, Google's Privacy Policy disclosed the at-issue data collection *at the very top*, using language as plain as "We collect information about the services that you use and how you use them, like when

you … visit a website that uses our advertising services, or view and interact with our ads and content." 7-ER-1379 ¶51. The Account Holder Agreements were similarly comprehensible. *See supra* A.3.

Plaintiffs ask this Court to hold these clear disclosures insufficient to describe the "specific practice" at issue. Pls. Br. 29. In so doing, they demand an unreasonable standard under which service providers must specify every possible feature and circumstance that does and does *not* affect generally disclosed data practices. Such a standard is tailored not to promote clarity or meaningful consent, but to facilitate a "gotcha" game by opportunistic plaintiffs—who would attack concise, broad disclosures as insufficiently specific, and more comprehensive disclosures as improperly dense and confusing. *See* Texas Br. 14. This Court should not adopt a standard under which no disclosure could ever be adequate.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Dated: February 9, 2024

Respectfully submitted,

/s/ Andrew H. Schapiro

Andrew H. Schapiro
Joseph H. Margolies
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606

Stephen A. Broome
Viola Trebicka
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

Christopher G. Michel
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000

*Attorneys for Defendant-Appellee Google, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this filing complies with the requirements of Ninth Circuit Rule 32(a). The total word count of this document is 13,867 words, excluding the items exempted by FRAP 32(f). The type size is 14-point and the typeface is Times New Roman, in compliance with FRAP 32(a)(5) and (6), respectively.


Dated: February 9, 2024                              */s/ Andrew H. Schapiro*

                                                                        Andrew H. Schapiro

## CERTIFICATE OF SERVICE

I, Andrew H. Schapiro, hereby certify that on February 9, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system.

/s/ Andrew H. Schapiro